819 A.2d 354

**Joy FRIOLO**

**v.**

**Douglas FRANKEL, M.D., et al.**

**No. 75, Sept. Term, 2002.**

Court of Appeals of Maryland.

March 17, 2003.

Leizer Z. Goldsmith (The Goldsmith Law Firm, on brief), Stephen Z. Chertkof (Heller, Huron, Chertkof, Lerner, Simon & Salzman, Washington, D.C.; Daniel A. Katz of Andalman & Flynn, Silver Spring) all on brief of Metropolitan Washington Employment Lawyers Association as *amicus curiae*.

Brief of *amici curiae* Public Justice Center, D.C. Employment Justice Center, CASA of Maryland, Inc., and Labor Council for Latin American Advancement, for appellant.

Wendy N. Hess, Murnaghan Appellate Advocacy Fellow, Baltimore.

Gerard J. Emig (Thomas K. McCraw, Jr. of Gleason, Flynn, Emig & Fogleman, Chartered, on brief), Rockville, for appellees.

Argued Before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, J.

Maryland statutes permit a court, in certain actions to collect wages allegedly due an employee or former employee, to award "reasonable counsel fees" to the plaintiff if he or she is successful in the action. The issue before us is whether, in calculating such fees, the court is required to use what has become known as the "lodestar" approach—that is, to start by multiplying the reasonable number of hours expended by the attorney on the litigation by a reasonable hourly rate and then to consider appropriate adjustments to the product of that multiplication.[1]

We shall hold generally that, in actions under fee-shifting statutes, including the two at issue here—Maryland Code, §§ 3–427 and 3–507.1 of the Labor and Employment

---

1. The term "lodestar" has an Anglo–Saxon origin—"lad," a way or path, and "sterre," a star. It thus was a guiding star. *See* Webster's Unabridged Dictionary at 1062. It later came to denote a "guiding ideal; a model for imitation." *Id.* At some point, the term began to be applied to the method noted for determining reasonable attorneys' fees.

Article (LE)—the lodestar approach is ordinarily the appropriate one to use in determining a reasonable counsel fee. We stress, however, that the approach we approve is broader than simply hours spent times hourly rate but also includes careful consideration of appropriate adjustments to that product, which, in almost all instances, will be case-specific. Under that approach, it is necessarily incumbent upon the trial judge to give a clear explanation of the factors he or she employed in arriving at the end result. Unfortunately, the judge did not do so in this case. We shall remand the case for a further proceeding and a better explanation.

## BACKGROUND

The issue presented to us arises from an action filed in the Circuit Court for Montgomery County by appellant, Joy Friolo, and her husband, Victor Salazar, against Douglas Frankel and the Maryland/Virginia Medical Trauma Group, appellees. Friolo and Salazar alleged that, in February, 1998, Dr. Frankel, a physician, hired Friolo as a medical biller, responsible for billing and collections, at a base salary of approximately $30,000. She averred that the practice, at the time, was a "failing venture," that, at some point, Frankel offered all of his employees a percentage interest "in the practice," that she accepted his offer, and that, as a result, she and Frankel agreed that she would get a 5% ownership interest in the medical practice in exchange for her participation in "evaluating and developing the practice." The goal, she said, was to make the practice worth $1 million by the end of 1999, to open four satellite offices within five years, and then to sell the entire practice in 2004. She was to get 5% of the sales price.

Friolo claimed that she worked more than 40 hours a week to maximize the recovery of receivables but that she never received any overtime pay, that she often worked at home on monthly, quarterly, and annual reports but was not paid for that time, and that she and Salazar attended strategic planning meetings and made various recommendations with respect to the practice. Salazar, though not formally employed

by Frankel, asserted that he frequently worked on Frankel's behalf by attending marketing meetings, assisting in the preparation of reports, and doing clerical work. Friolo claimed that, as part of her 5% ownership interest, she was to receive, on a monthly basis, 5% of all medical insurance reimbursements and collections received, but that she did not receive full payment of those amounts. Frankel, she said, had agreed to put this arrangement in writing by December 15, 1998, but failed to do so.

Friolo went on bereavement leave from March 9 to March 25, 1999, but worked from March 26 to April 2. On Sunday, April 4, Frankel called her at home, complained that she had been rude to two patients and had not been doing her job properly, and discharged her. He denied at the time (and has continued to deny) that she had any ownership interest in the practice. Friolo claimed a right to 417 hours of overtime pay, and Salazar claimed an entitlement to compensation for his work.

On these basic allegations, Friolo and Salazar made the following claims. In Count One, Friolo alleged that she and Frankel had an express contract for her to receive a 5% ownership interest in the medical practice, that pursuant to that contract, she was to receive, in addition to her base salary, 5% of the monthly receivables collected, that Frankel breached that contract by withholding $3,365 from her monthly entitlements for the period March, 1998 through February, 1999, $2,637 for March, 1999, and the entire sums for April and May, 1999. In Count Two, she alleged the existence of a similar implied contract and sought the same damages. Count Three charged Frankel with unjust enrichment—that he benefitted from Friolo's labor and failed to pay the promised consideration. Count Four charged that Frankel had fraudulently induced her to perform services by promising to give her an interest in the practice—a promise he never intended to keep. Count Five alleged that Frankel's withholding of her percentage of the receivables she collected constituted a violation of the Wage Payment and Collection Law (LE, §§ 3–503 and 3–505) (Payment Law). Count Six alleged that, by failing

to pay her time-and-a-half for her overtime hours, Frankel violated the Maryland Wage and Hour Law (LE, §§ 3–415 and 3–420) (Wage and Hour Law) and claimed that she was entitled to $9,070 for 417 hours of overtime.

Counts Seven through Ten were on behalf of Salazar. Count Seven was for breach of express contract and sought recovery for approximately 200 hours that Salazar claimed he worked for Frankel from February, 1998, through February, 1999. He averred that he performed this work without compensation upon Frankel's representation that he would be compensated through the value of his wife's ownership interest in the corporation. Count Eight alleged breach of an implied contract to the same effect; Count Nine charged Frankel with unjust enrichment of the value to Salazar's 200 hours of work; and in Count Ten Salazar sought recovery of $1,030 in wages (200 hours times the minimum wage of $5.15/hour) under the Wage and Hour Law and the Payment Law. In addition to these various sums alleged in the specific counts, Friolo and Salazar sought punitive damages, prejudgment interest, and attorneys' fees and costs.

Toward the end of trial, after Frankel testified, Friolo withdrew her claim to 5% of the practice and focused instead on the bonus arrangement she claimed she and Frankel had. Frankel testified that he never agreed to give Friolo an interest in his medical practice or to pay her 5% of all sums collected. He admitted to a bonus arrangement but claimed that there was a base amount that had to be met and that her entitlement was to a percentage of each $500 collected over that amount. He said that he had paid all bonus sums that were due under that arrangement. Frankel also contended that Friolo was exempt from the overtime requirements of the Wage and Hour Law because she was in an administrative or managerial position. The issues as to the overtime claim were (1) whether Friolo was, in fact, in a managerial position and therefore exempt from the overtime requirement, and (2) if not, how much she was owed.

At the end of the plaintiffs' case, all of Salazar's claims were dismissed on the ground that there was insufficient evidence to show any employment relationship between him and the defendants. Salazar conceded that he had failed to prove Counts Eight and Nine and consented to the dismissal of those counts. Counts Two, Three, and Four of Friolo's action were also dismissed, with her consent. The only claims submitted to the jury were those embodied in Counts One (breach of express contract to give her a 5% bonus on monthly collections), Five (failure to pay the bonuses and the overtime pay in violation of the Payment Law), and Six (failure to pay overtime rate in violation of Wage and Hour Law). With respect to the monthly bonuses, Friolo claimed an entitlement to $6,841. That was based on gross receivables of $528,320, 5% of which amounted to $26,415. Frankel had paid $19,574 of that amount under his view of what the arrangement was, leaving a balance allegedly due of $6,841. She also claimed an entitlement to $5,237 in overtime pay for 240 hours of overtime work, down from the 417 hours she had alleged in her amended complaint.

LE § 3–507.1(b), which is part of the Payment Law, provides that if, in an action under that Act, a court finds that an employer withheld the wage of an employee in violation of the Act and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding three times the wage and reasonable counsel fees and costs. In *Admiral Mortgage, Inc. v. Cooper*, 357 Md. 533, 745 A.2d 1026 (2000), we held that any counsel fee to be awarded under that section was for the judge, not the jury, to determine. The court instructed the jury that, if it found that Frankel withheld wages due Ms. Friolo and that such withholding was not the result of a bona fide dispute, the jury could award her extra compensation up to three times the amount she was entitled to receive, but, in accordance with *Admiral Mortgage, Inc.*, said nothing to the jury about counsel fees.

The jury found that Frankel had failed to pay $6,841 in bonuses and $4,937 in overtime pay but determined specifically that no amount of enhanced damages should be awarded

with respect to either amount. Accordingly, on July 3, 2001, judgment was entered in Friolo's favor in the aggregate compensatory amount of $11,778. It does not appear that any amount was added for pre-judgment interest.

Two weeks later, Friolo filed a motion seeking attorneys' fees of $55,012, nearly five times the amount of the recovery. That amount was calculated according to the lodestar approach, as follows:

| Attorney | Hourly Rate | Hours | Lodestar Amount |
|---|---|---|---|
| Leizer Goldsmith | $305 | 164.4 | $47,733.50 |
| Karen Bower | 250 | 31.6 | 7,911.00 |
| Julie Martin | 250 | 33.2 | 4,202.50 |
| Regina Schowalter | 90 | 34.1 | 1,278.00 |
| TOTAL | | 263.3 | $61,125.00 |

The hourly rates for Goldsmith, Bower, and Martin were taken from a "matrix" maintained by the U.S. Attorney for the District of Columbia, which, in turn was taken from one used by the U.S. District Court in *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354, 371 (D.D.C.1983), *rev'd in part on other grounds*, 740 F.2d 1071 (D.C.Cir.1984), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985).

From the gross amount, Friolo deducted 10%, or $6,112.50, to reflect the fact that not all of Friolo's claims were successful. That produced a net claim of $55,012.50. She asked, in addition, for post-judgment interest and reimbursement for other costs of $392.45. In a supplement filed July 31, 2001, Friolo raised the requested amount of fees and costs. The supplement reduced the number of hours expended by Ms. Martin from 33.2 to 18.1 and by Ms. Showalter from 34.1 to 14.2 but nonetheless increased the gross lodestar amount to $63,399.50 based on a total of 228.3 hours. With a 10% reduction, the net fee request became $57,059, to which was added $1,201 in costs. The supplement explained that Ms. Showalter, whose time was billed at the rate of $90/hour, was

a third year law student, and that Ms. Martin, whose time was billed at $250/hour, had been practicing law for seven years.

Nowhere, in either the motion or the amendment, did Friolo allege what arrangement she had with her attorneys with respect to a fee—whether they had accepted the case on an hourly basis, whether there was a set fee for the litigation, whether there was some sort of contingency fee arrangement, whether they had agreed not to charge her any fee at all but accept only what the court may award under the statutes, whether any fee awarded by the court was to be in addition to or applied as a credit against any fee charged to her.

Frankel responded that, as the jury failed to find that the withholdings were not the result of a bona fide dispute, there was no occasion for *any* attorneys' fee to be awarded. He also noted that the so-called *Laffey* matrix had never been accepted by any Maryland court and that the cases in which it had been used involved gross misconduct on the part of the defendant, which was not the case here. This dispute, he urged, was simply the product of a disagreement over the terms of the employment and that most of Friolo's claim and all of Salazar's claim had been rejected, either by the court as a matter of law or by the jury as a matter of fact. Frankel urged that the requested fees, being more than five times the amount of recovery and 20 times what a normal one-third contingency fee would produce, were unreasonable.

After listening to argument and having considered the memoranda filed by the parties, the court concluded first that attorney fee awards need to be "appropriate and fair," even when "punitive." It then noted that, under the lodestar analysis, two of the factors the court must consider are the novelty and difficulty of the litigation, but it made no finding with respect to either factor. It observed that the jury had returned a verdict of $11,778, which the court said was not inappropriate, and then stated:

"What the Court is going to do by way of award is considering the [lodestar] language and the record in this matter, I deem it appropriate to—this case is interesting in looking at

the computations awarding 40 percent of the judgment plus the $1,500 in court costs so that comes out to $4,712.00 plus $1,500.00—$6,212.00 is the counsel fees and costs."

The judgment order more or less reflected that decision. It granted Friolo's motion and directed Frankel to pay to Friolo or her counsel forty percent of the amount of judgment, which was calculated to be $4,711, for statutory attorneys' fees, plus $1,552 in costs. Aggrieved, Friolo appealed, complaining, in essence, that the trial court erred in failing to calculate the fees in accordance with the lodestar approach, despite what she regards as her "high degree of success before the court." We granted *certiorari* before any proceedings in the Court of Special Appeals.

## DISCUSSION

Friolo points out, correctly, that, in applying Federal fee-shifting statutes, the Federal courts have adopted the lodestar approach for determining the amount of fee to be paid by the loser and have created a set of criteria for measuring the fee. *See Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). She asserts that, in *Admiral Mortgage, Inc. v. Cooper, supra,* 357 Md. 533, 745 A.2d 1026, we "strongly suggested" that Maryland courts use that approach in awarding fees under the State wage collection laws and complains that the trial court, though mentioning the word "lodestar" in its brief remarks from the Bench, failed to consider the established criteria and thus failed to apply the lodestar approach.

Frankel responds that the allowance of *any* fee is discretionary—that the two statutes merely *permit* the court to award a reasonable fee and that there is no entitlement to one. Indeed, he reads LE § 3–507.1 as allowing the award of counsel fees only upon a finding that the withholding was not the result of a bona fide dispute which, he claims, was not made in this case. In his view, *no* fee was appropriate and certainly not one five times greater than the amount of recovery. Frankel contends that the trial judge was aware of

the Federal criteria, as he mentioned two of them, but that he was not required by *Admiral Mortgage, Inc.*, or any other law, to adhere rigidly to the lodestar approach.

### Standard of Review

A preliminary disagreement exists over the standard of review that we should apply. As noted, Friolo believes that, in disregarding the lodestar approach, the court erred as a matter of law, and that, accordingly, we should conduct a *de novo* review and are free to substitute our judgment for that of the trial court. Frankel, keying on the statutes, urges that both the allowance of a fee and its calculation are discretionary with the trial court and that the only issue is whether the court abused its discretion in setting the fee equivalent to 40% of the recovery.

Frankel is correct in arguing that the decision whether to allow *any* fee is discretionary, although, as we shall explain, that discretion is to be exercised liberally in favor of allowing a fee. A fee *was* allowed here, and no cross-appeal was taken from that decision. That issue, therefore, is not before us, either as legal error or abuse of discretion. The only issue is whether, in determining the amount of the fee, the court was required, as a matter of law, to use the lodestar approach and failed to do so. That is a threshold issue of law. If we conclude, as we shall, that the lodestar approach is the appropriate one to use and that the record does not support a conclusion that the trial court actually used that approach, there would be an error of law. The result of such a conclusion is not a direction to enter judgment for the amount claimed by Friolo, however, which appears to us, even under a lodestar approach, not to be a reasonable fee, but rather a remand for a further proceeding, in which the court can apply the lodestar approach and determine a reasonable fee. The setting of a fee under that approach is largely discretionary.

### The Statutes in Question

We begin our response to the various arguments with a brief analysis of the current state of Maryland law. As noted,

there are two statutes at issue. Title 3, subtitle 4 of the Labor and Employment Article constitutes the Wage and Hour Law—the State parallel to the Federal Fair Labor Standards Act. It requires, in relevant part, that employers pay the applicable minimum wage to their employees and, in LE §§ 3-415 and 3-420, that they pay an overtime wage of at least 1.5 times the usual hourly wage for each hour over 40 that the employee works during one workweek. Section 3-403 excludes from the Act individuals employed in a capacity that the Commissioner determines, by regulation, to be administrative, executive, or professional, or who are paid on a commission basis.

The Commissioner of Labor and Industry is given general authority to enforce the statutory requirements by administrative action, subject to judicial review. *See* LE §§ 3-408 and 3-426. LE § 3-427 provides as well for individual enforcement. It authorizes an employee who has been paid less than the required wage to bring an action against the employer to recover the difference between the wage paid and the wage required to be paid. Recognizing that many of these claims may be small ones and that employees may be unfamiliar with how to file and prosecute a lawsuit, § 3-427(b) permits the Commissioner, at the request of the employee, to take an assignment of the claim in trust for the employee and ask the Attorney General to file the action on the employee's behalf. Subsection (d), which is most at issue, states that, "[i]f a court determines that an employee is entitled to recovery in an action under this section, the court *may* allow against the employer reasonable counsel fees and other costs." (Emphasis added). There is no provision in the Wage and Hour Law for enhanced damages; the only recovery allowed, aside from costs and reasonable counsel fees, is the difference between the wage due and the wage paid.

Subtitle 5 of title 3 constitutes the Payment Law. That law does not concern the amount of wages payable but rather the duty to pay whatever wages are due on a regular basis and to pay all that is due following termination of the employment. Section 3-502 requires employers to establish regular pay

periods and to pay wages in currency or by check or direct deposit that is convertible to currency. Section 3–503 prohibits employers from making unauthorized deductions. Section 3–505, dealing with the situation in which there is a termination of employment, requires employers to pay employees all wages due for work performed before the termination, on or before the day on which the employee would have been paid had employment not been terminated. As with the Wage and Hour Law, the Commissioner of Labor and Industry is given some enforcement power. The Commissioner is authorized to attempt to resolve any issue involved in the violation informally by mediation and, with the consent of the employee, to request the Attorney General to bring an action on the employee's behalf to collect any amounts that may be due. *See* § 3–507.

Section 3–507.1 permits a separate action by the employee if the employer fails to pay wages due within two weeks after the wages were due to be paid. Subsection (b) of that section provides:

> "If, in an action under subsection (a) of this section, a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court *may* award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs."

(Emphasis added).

As noted, Friolo sued under both statutes. The instructions to the jury did not mention either statute in particular, and the special verdicts returned by the jury did not mention either of them. At least with respect to the bonuses, it would appear that Friolo had no claim under the Wage and Hour Law. Her base salary was well above the required minimum wage, and the bonuses were purely a matter of contract. In this case, they would thus be recoverable only under Count One, for breach of contract, as to which there is no fee-shifting authority, or, because they constituted part of her wage and

remained unpaid after termination of her employment, under the Payment Law.

The claim for overtime pay is a bit more confused. Friolo seemed to imply in her amended complaint that her overtime work was part of the consideration for the 5% ownership interest that she was promised, and it was only when Frankel terminated her employment and denied her ownership claim that the overtime pay seemed to become an issue. In her testimony, she said that she had raised the issue of overtime with Frankel, that he had denied her entitlement to it on the ground that she was a salaried or managerial employee, and that, until her employment was terminated, she accepted that explanation. Clearly, she was entitled to sue under both statutes to recover any overtime pay that remained due after termination of her employment.

In both § 3–427(d) and § 3–507.1(b), the Legislature provided that the court "may" award reasonable counsel fees. There is no statutory requirement that it do so. Nonetheless, it is clear to us that the Legislature intended that discretion to be exercised liberally in favor of awarding fees, at least in appropriate cases.

The Wage and Hour Law shares the benevolent purpose of its Federal partner, the Fair Labor Standards Act. The Legislature declared its intent in § 3–402—to set minimum standards (1) to provide a maintenance level consistent with the general health and well-being of the population, (2) to safeguard employers and employees against unfair competition, (3) to increase the stability of industry, (4) to increase the buying power of employees, and (5) to decrease the need to spend public money for the relief of employees. The standards, are, indeed, minimal ones, and it is critical, if the legislative purposes are to be attained and preserved, that those standards be vigorously enforced.

The substantive provisions of the Payment Law were first enacted in 1966. 1966 Md. Laws, ch. 686. The law allowed the Commissioner of Labor and Industry to file suit on behalf of employees to collect wages that were unlawfully withheld

and provided minor criminal penalties for violations, but it provided no statutory action for the individual employee. The employee was presumably free to file a breach of contract action against the employer if the employee either was knowledgeable enough to do so on his or her own or could find a lawyer willing to take the case. Over the years, the law was amended, first to provide for civil penalties of up to 10%, later 20%, of the wages due, and, in 1983, to substitute for the civil penalties a provision that permitted a court, in an action *by the Commissioner,* to award to the employee up to three times the amount of wage unlawfully withheld if the court found that the withholding was not a result of a bona fide dispute. The law said nothing about counsel fees. The Attorney General, of course, represented the Commissioner in any suit filed under the statute.

What apparently led to § 3–507.1, in 1993, was the crippling of the Commissioner's ability to enforce either the Payment Law or the Wage and Hour Law due to budget cuts in his office. The enforcement function, apparently under both statutes, was centered in the Wage and Hour Section of the Division of Labor and Industry, which was eliminated as of November 1, 1991, due to a lack of funding. In reaction to the demise of that unit, two bills (SB 274 and HB 1006) were introduced into the 1993 session to permit employees to file their own action for unpaid wages under the Payment Law. That ability already existed under the Wage and Hour Law, so neither bill addressed that statute.

The House Bill provided for automatic treble damages and counsel fees if the court determined that the employee was entitled to recovery; the Senate Bill had no such provision. In testimony on the House Bill, the Division of Labor and Industry reported that, in the five years preceding the elimination of the Wage and Hour Section, an average of 3,000 unpaid wage claims had been filed annually with the Division, that, after investigation, about 45% of them were found to be legitimate, and that the Division had collected about $550,000 annually on those claims. Other evidence indicated that about 1,500 claims were referred annually to the Attorney General,

that most of the referred cases settled, and that only about 240 suits were filed in Circuit Court. Most of those cases, about 180, were resolved in the Commissioner's favor on summary judgment, and in 80% of them, treble damages were awarded. The Executive Director of the Maryland Volunteer Lawyers Service reported that the majority of the claims were on behalf of low income people and involved between $150 and $200.

Concern was expressed by proponents of the bills that these employees often had no other resource available to assist them in pursuing their claims, and the proponents therefore supported both the treble damage and counsel fee provisions in the House Bill. Business groups noted that, in an action filed by the Commissioner under § 3–507, there was no provision at all for counsel fees, and *up to* treble damages could be awarded only if there was a finding that the wage was not withheld pursuant to a bona fide dispute, and they opposed the provision in the House Bill for an automatic award of counsel fees and treble damages merely in the event the court found the wage was due. The Legislature gave some credence to that objection and amended both bills (1) to permit counsel fees to be awarded in an action by the Commissioner under § 3–507, and (2) to allow counsel fees and up to treble damages in an action by the employee only upon a finding that the wage was not withheld pursuant to a bona fide dispute. With those, and certain other, amendments, both bills passed. The Governor signed the House Bill (1993 Md. Laws, ch. 578) and vetoed the Senate Bill as being unnecessary.

Although the 1993 Act dealt only with the Payment Law, it was clear that the problem sought to be remedied—the inability of the Commissioner to continue to pursue claims for unpaid wages—existed as well under the Wage and Hour Law, which, as noted, also provided for employee suits and the award of counsel fees. Unquestionably, the provisions for counsel fees in § 3–427(d) and § 3–507.1(b) are remedial in nature and should therefore be given a liberal interpretation. *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Harrison v. Pilli,* 321 Md. 336, 341, 582 A.2d 1231, 1234 (1990).

Courts must keep that in mind when deciding *whether* to award a fee.

An action under the Wage and Hour Law is to recover the minimum amounts set by law, and the provision for counsel fees is an important element in ensuring that the law is obeyed. In strengthening the Payment Law in 1993, the Legislature considered the arguments pro and con and struck the balance of allowing a reasonable counsel fee under § 3–507.1 only in those situations where the employer acted wilfully—in the absence of a bona fide dispute. When such a finding is made in an action under that law or when recovery is allowed under the Wage and Hour Law, courts should exercise their discretion liberally in favor of awarding a reasonable fee, unless the circumstances of the particular case indicate some good reason why a fee award is inappropriate in that case. *See Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40, 48 (1983) (holding that under 42 U.S.C. § 1988, which allows the award of attorneys' fees in a civil rights action under § 1983, "a prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust,'" quoting S.Rep. No. 94–1011, p. 4 (1976)).

### *Calculation of the Fee*

Friolo contends that, in *Admiral Mortage Inc., supra,* 357 Md. 533, 745 A.2d 1026, we "strongly suggested" that Maryland courts follow the lodestar approach. We did no such thing. *Admiral Mortgage* was an action under the Payment Act by a former employee to recover unpaid commissions that he claimed were due on loans placed by him but not closed prior to his resignation. The employer claimed that no commissions were due. The matter was submitted to a jury, which decided that commissions were due and that the employer's withholding of them was not because of a bona fide dispute. It awarded the amount it found due, nearly (but not quite) treble damages, and attorneys' fees. The principal issues before us were (1) whether there was sufficient evidence of a lack of bona fide dispute, and (2) whether the court

erred in submitting the determination of attorneys' fees to the jury.

We concluded that there *was* sufficient evidence to show a lack of bona fide dispute but that the allowance and calculation of attorneys' fees was for the judge, not the jury, to determine. In that latter regard, we drew a distinction between the allowance of enhanced damages and the allowance of attorneys' fees. The discretion to allow enhanced damages, we said, was the kind of discretion ordinarily committed to the trier of fact but that attorneys' fees were another matter. For one thing, they may continue to accrue after the verdict is rendered if post-trial motions or appeals are filed, and thus may not be finally determinable by a jury in any event. Moreover, we pointed out that those fees, when allowed, have traditionally been set by a judge, "who is usually in a far better position than a jury to determine what is reasonable." *Admiral Mortgage*, 357 Md. at 548, 745 A.2d at 1033.

In elucidating that point, we noted that, in the Federal system, attorneys' fees awarded under fee-shifting statutes were calculated in accordance with the lodestar approach—the product of reasonable hours times a reasonable rate—and concluded that the determination of those two items involved a number of factors that were both subjective and judgmental. In Maryland, we said, that approach would include consideration of the factors set forth in Rule 1.5 of the Maryland Rules of Professional Conduct, among which were the novelty and difficulty of the questions involved and the skill requisite to perform the legal service adequately. Those factors, we observed, were more judgmental than fact-based and therefore more apt to be within the expertise of a judge than of lay jurors. In a footnote to that discussion, we noted:

> "Complicating even that examination is the issue, which ultimately we would need to decide, of whether, if the 'lodestar' approach is to be used, the amount determined in accordance with that approach is subject to increase or decrease to account for other factors, including the fee agreement between the lawyer and the plaintiff, especially

where the plaintiff's lawyer is on a contingency fee arrangement."

*Id.* at 553 n. 13, 745 A.2d at 1036 n. 13.

Nowhere in *Admiral Mortgage* did we "strongly suggest" that Maryland courts use the lodestar approach, and we certainly did not endorse, or even mention, any "matrix" adopted by the U.S. Attorney in the District of Columbia, or by anyone else, in applying a lodestar method. The issue was not before us.

Friolo also relies on *Md.–Nat'l Cap. P. & P. Com'n v. Crawford*, 307 Md. 1, 511 A.2d 1079 (1986), in which we did approve a lodestar approach. The action in *Crawford* was under 42 U.S.C. §§ 1983 and 1988. At issue, among other things, was the validity of an attorney's fee in favor of the successful litigant that was based on a lodestar approach but included a $10,000 "bonus" to make cases like that one more attractive to lawyers, to compensate the lawyers for the "irritation" of having to defend the underlying judgment on appeal and for the deferred payment of the fee, and to reward the lawyers for any continued litigation. *Id.* at 40–41, 511 A.2d at 1099. It does not appear that anyone challenged the basic lodestar approach, although there was an issue over the reasonableness of the hours allegedly spent on the case. We found the bonus to be unreasonable and remanded for reconsideration of the fee in light of the guidelines set in our opinion and in *Hensley v. Eckerhart, supra*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 and *City of Riverside et al. v. Rivera et al.*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986).

We did not adopt a lodestar approach in *Crawford* as a matter of Maryland law and certainly not with respect to the statutes under consideration here. As noted, *Crawford* was an action under 42 U.S.C. § 1983, and, in remanding for reconsideration in conformance with the *Hensley* guidelines (but without the bonus), we simply took account of the fact that the Supreme Court had adopted that approach under

§ 1988 for § 1983 cases and that there seemed to be no opposition to that approach in the *Crawford* case.

The lodestar approach was developed principally in the Federal system, where, as the Supreme Court noted in *Pennsylvania v. Del. Valley Citizens' Council,* 478 U.S. 546, 562, 106 S.Ct. 3088, 3096, 92 L.Ed.2d 439, 454 (1986), there are over 100 separate statutes providing for the award of attorneys' fees. The development of that approach was traced recently in *Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 152 L.Ed.2d 996 (2002). It stemmed, according to Justice Ginsburg, from internal accounting practices adopted by lawyers in the 1940's to determine whether their fees were adequate. *Id.* at 799, 122 S.Ct. at 1824, 152 L.Ed.2d at 1006. In 1958, the American Bar Association, concerned that attorneys' earnings had not kept pace with inflation, urged attorneys to keep records of the hours spent on each case, in order to ensure that the fee ultimately charged provided reasonable compensation for the attorney's effort. *Id.* Although other methods of billing continued to be used, Justice Ginsburg observed that, as it became standard accounting practice to record hours spent on client matters, attorneys found that billing by hours was both convenient and easily explained to the client, and that, by the 1970's, the practice of hourly billing had become widespread. *Id.* at 799, 122 S.Ct. at 1824, 152 L.Ed.2d at 1007.

The Federal courts did not initially embrace that approach as a predominant criterion. In *Lindy Bros. Bldrs., Inc. of Phila. v. American R. & S. San. Corp.,* 487 F.2d 161, 168 (3d Cir.1973), a class action antitrust case, the court concluded that, while the lodestar approach was an important beginning, a court could not properly determine a fee award just by multiplying hours by rate, but that two other factors were also important—the contingent nature of success (*i.e.,* the likelihood of any recovery) and the extent to which the complexity and novelty of the issues, the quality of the attorney's work, and the recovery obtained mandate an increase or decrease. A year later, the Court of Appeals for the Fifth Circuit, in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714,

717–19 (5th Cir.1974), held that, in setting fees under 42 U.S.C. § 2000e–5(k)—Title VII of the Civil Rights Act of 1964—courts should consider twelve factors, one of which was hours devoted to the case.[2]

Within the next decade, the lodestar approach clearly took hold and ultimately, after *Hensley v. Eckerhart, supra,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40, *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), and *Pennsylvania v. Del. Valley Citizens' Council, supra,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439, achieved dominance in the Federal system and "became the guiding light of our fee-shifting jurisprudence." *Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 2641, 120 L.Ed.2d 449, 456 (1992); *Gisbrecht v. Barnhart, supra,* 535 U.S. at 802, 122 S.Ct. at 1825, 152 L.Ed.2d at 1007.

More important to us than the *fact* that the Federal courts have embraced the lodestar approach is *why* they have done so and how they have implemented that approach. *Hensley* explains both. The case began as a multi-faceted class action attack on a variety of practices employed by a State mental health facility, including its failure to pay the minimum wage

---

**2.** The twelve factors set forth in *Johnson,* offered as guidelines for trial courts to use, were: (1) the time and labor required (the judge should weigh the hours claimed against his or her own knowledge, experience, and expertise and, if more than one attorney is involved, scrutinize the possibility of duplication); (2) the novelty and difficulty of the questions (cases of first impression generally require more time and effort); (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent (fee agreed to by client is helpful in demonstrating attorney's fee expectations, litigant should not be awarded fee greater than that he is contractually bound to pay); (7) time limitations imposed by the client or circumstances (whether this was priority work); (8) the amount involved and the results obtained (court should consider amount of damages awarded but also whether decision corrects across-the-board discrimination affecting large class of employees); (9) experience, reputation, and ability of attorneys; (10) undesirability of the case (effect on the lawyer in the community for having agreed to take an unpopular case); (11) nature and length of professional relationship with he client; and (12) awards in similar cases.

for work done by the patients, but ended up with a one-count complaint that certain conditions at the facility deprived the residents of their Constitutional right to treatment. *Hensley*, 461 U.S. at 426–27, 103 S.Ct. at 1936, 76 L.Ed.2d at 46. During the pretrial period, the State changed a number of its practices to meet some of the complaints (including commencing to pay patients for the work they did), which led to the filing of narrower amended complaints and a constriction of the issues for trial. *Id.* After trial, the court found merit in some, but not all of the remaining claims, and the issue, generated by a petition for attorneys' fees, was whether the partially prevailing plaintiffs could recover fees for legal services related to the unsuccessful claims. *Id.* at 427–29, 103 S.Ct. at 1936–37, 76 L. Ed 2d at 46–47.

The right to claim a fee arose from § 1988—the Civil Rights Attorneys' Fees Awards Act of 1976—which was a response to *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) and authorized courts to award a reasonable attorney's fee in civil rights litigation. *Hensley*, 461 U.S. at 429, 103 S.Ct. at 1937, 76 L.Ed.2d at 47–48. The *Hensley* Court noted that both the House and Senate Reports relating to that Act referred favorably to the *Johnson* case and others that applied the 12-factor analysis. *Id.* at 429–30, 103 S.Ct. at 1937–38, 76 L.Ed.2d at 48. From those cases and legislative references, the Court concluded, first, that a plaintiff can be a prevailing party, and thus eligible to seek a fee under § 1988, if the plaintiff succeeds on any significant issue that achieves some of the benefit sought in bringing the action; he or she does not have to win it all to be regarded as prevailing. *Id.* at 433, 103 S.Ct. at 1939, 76 L.Ed.2d at 50.

With respect to calculation of the fee, the Court concluded that "[t]he most useful starting point" for determining the amount of a reasonable fee was the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939, 76 L.Ed.2d at 50. That calculation, the Court said, provided an objective basis on which to make "an initial estimate" of the

value of the lawyer's services. *Id.* The Court admonished that hours that were "excessive, redundant, or otherwise unnecessary" should be excluded, as hours not properly billed to one's client are also not properly billed to the adversary. *Id.* at 434, 103 S.Ct. at 1940, 76 L.Ed.2d at 51. Even with those adjustments, the product of hours times rate does not end the inquiry. The Court noted that there remained other considerations that might lead to an upward or downward adjustment, including "the important factor of the 'results obtained.'" *Id.* As a footnote to that statement, the Court held that the trial judge "may also consider other factors identified in [*Johnson*]," although it noted that many of those factors are subsumed within the initial lodestar calculation. *Id.* at 434 n. 9, 103 S.Ct. at 1940 n. 9, 76 L.Ed.2d at 51 n. 9.

Where the plaintiff has succeeded only in part, the Court concluded that two questions need to be addressed: (1) whether the plaintiff failed to prevail on claims that were unrelated to the claims upon which he or she succeeded; and (2) whether the plaintiff achieved a level of success that makes the hours reasonably expended a satisfactory basis for a fee award. *Id.* at 434, 103 S.Ct. at 1940, 76 L.Ed.2d at 51. With respect to the first, the relevance is that if the successful and unsuccessful claims are unrelated, work done on the unsuccessful claim cannot be deemed to have been expended in pursuit of the successful claim. The Court treated unrelated claims as if they had been raised in separate lawsuits, and therefore "no fee may be awarded for services on the unsuccessful claim." *Id.* at 435, 103 S.Ct. at 1940, 76 L.Ed.2d at 51. That issue, the Court surmised, might not arise often, as civil rights cases usually involve a single claim and in other cases the relief sought frequently involves a common core of facts or related legal theories. In those situations, counsel's time will usually be devoted to the overall litigation, making it difficult to divide the hours expended on a claim-by-claim basis, and the claims should therefore be regarded as related. *Id.*

With respect to the second factor—the level of success—the Court concluded that, when the plaintiff has obtained "excellent results," the attorney should recover "a fully compensato-

ry fee." *Id.* at 435, 103 S.Ct. at 1940, 76 L.Ed.2d at 52. Normally, that would encompass all hours spent on the litigation, without reduction because the plaintiff failed to prevail on every claim, and, indeed, in cases of "exceptional success," an enhanced award may be justified. *Id.* Conversely, if the plaintiff has achieved "only partial or limited success," the product of hours reasonably spent on the litigation times the hourly rate "may be an excessive amount," even where the "claims were interrelated, nonfrivolous, and raised in good faith." *Id.* at 436, 103 S.Ct. at 1941, 76 L.Ed.2d at 52. The critical factor, the Court said, "is the degree of success obtained." *Id.*

All of this relates to how the lodestar approach is to be implemented. The Court also spoke to the underlying rationale for the approach. It observed:

> "Application of this principle is particularly important in complex civil rights litigation involving numerous challenges to institutional practices or conditions. This type of litigation is lengthy and demands many hours of lawyers' services. Although the plaintiff often may succeed in identifying some unlawful practices or conditions, the range of possible success is vast. That the plaintiff is a 'prevailing party' therefore may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved."

*Id.* at 436, 103 S.Ct. at 1941, 76 L.Ed.2d at 52.

The ultimate holding was that "there is no precise rule or formula for making these determinations"—that the trial court may, in its discretion, eliminate specific hours or simply reduce the award to account for the limited success. *Id.* at 436–37, 103 S.Ct. at 1941, 76 L.Ed.2d at 52.

The views expressed in *Hensley* were confirmed in three subsequent cases involving fee-shifting statutes. *See Blum v. Stenson, supra,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891; *Pennsylvania v. Del. Valley Citizens' Council, supra,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439; and *Burlington v. Dague, supra,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449. The

Court noted in the *Pennsylvania* case that the fee-shifting statutes "were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client." *Id.* at 565, 106 S.Ct. at 3098, 92 L.Ed.2d at 456. Rather, it said, "the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws," and, if plaintiffs are able to engage a lawyer "based on the statutory assurance that he will be paid a 'reasonable fee,' the purpose behind the fee-shifting statute has been satisfied." *Id.* at 565, 106 S.Ct. at 3098, 92 L.Ed.2d at 456–57. In *Burlington,* the Court concluded that it was inappropriate to enhance an initial lodestar calculation to reflect the fact that the attorneys were employed on a contingent fee basis and thus compensate them for the risk of loss and non-payment. *Burlington,* 505 U.S. at 565, 112 S.Ct. at 2642–43, 120 L.Ed.2d at 458.

The last word from the Supreme Court, so far, came in *Gisbrecht v. Barnhart, supra,* 535 U.S. 789, 122 S.Ct. 1817, 152 L.Ed.2d 996. That case did not involve a fee-shifting statute but how the lodestar approach meshed with a provision of the Social Security Act that limited the fee that attorneys could charge for representing social security claimants to a maximum of 25% of past-due benefits recovered. Like the situation with our workers' compensation law, the fee was to be paid from the benefits awarded. The issue was whether the 25% amount was presumptively reasonable or whether the court was required to use the lodestar approach to set the fee. *Id.* at 792, 122 S.Ct. at 1820, 152 L.Ed.2d at 1001–02. In each of three cases, the attorney had a 25% contingent fee agreement, but the trial court disallowed those fees and awarded lower fees based on lodestar. *Id.* at 798, 122 S.Ct. at 1823, 152 L.Ed.2d at 1005. Although once again confirming that the lodestar method continued to "hold[ ] sway in federal-court adjudication of disputes over the amount of fees properly shifted to the loser in litigation," the Court concluded that, by permitting the 25% arrangement in the Social Security Act,

Congress did not intend to displace contingency fee agreements "as the primary means by which fees are set for successfully representing Social Security benefits claimants in court." *Id.* at 802, 807, 122 S.Ct. at 1825, 1828, 152 L.Ed.2d at 1008, 1011.

Following the Federal lead, a number of States have also employed the lodestar approach, with its accompanying adjustments, in setting attorneys' fees under fee-shifting statutes. *See City of Birmingham v. Horn,* 810 So.2d 667 (Ala. 2001) (class action concerning placement of waste transfer station); *Edwards v. Alabama Farm Bureau Mutual Casualty Ins. Co.,* 601 So.2d 82 (Ala.1992) (action under Federal and State truth-in-lending laws); *Edgerton v. State Personnel Board,* 83 Cal.App.4th 1350, 100 Cal.Rptr.2d 491 (Cal.App. 2000) (violation of Constitutional right); *Dutcher v. Randall Foods,* 546 N.W.2d 889 (Iowa 1996) (violation of Federal Equal Pay Act and Iowa Civil Rights Act); *Fontaine v. Ebtec Corp.,* 415 Mass. 309, 613 N.E.2d 881 (1993) (discharge from employment in violation of Federal and State age discrimination laws); *Podhorecki v. Lauer's Furniture Stores, Inc.,* 184 A.D.2d 1066, 585 N.Y.S.2d 268 (1992) (violation of consumer protection law); *Paradinovich v. Milwaukee County,* 189 Wis.2d 184, 525 N.W.2d 325 (Wis.1994) (civil rights violation).

In focusing on the lodestar approach, or, indeed, any other, we must be mindful of Rule 1.5 of the Maryland Rules of Professional Conduct, which also requires that a lawyer's fee be reasonable and which sets out factors to be considered in determining the reasonableness of a fee. Most of them are identical or similar to the factors enumerated in *Johnson v. Georgia Highway Express, supra,* 488 F.2d 714, which the *Hensley* Court indicated were relevant even in a lodestar analysis.[3]

---

**3.** Rule 1.5(a) provides as follows:

"A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

The Rule is important to note because it puts a limit on what a lawyer may charge his or her own client.  In *Attorney Griev. Com'n v. Korotki*, 318 Md. 646, 665, 569 A.2d 1224, 1233 (1990), while reserving on whether "there can ever be circumstances justifying a contingent fee in excess of fifty percent," we concluded that "it is generally a violation of the rule for the attorney's stake in the result to exceed the client's stake." Given the rather simple issues in this case, it certainly would have been impermissible under Rule 1.5 for counsel to charge Ms. Friolo $57,000 based on a less-than-$12,000 recovery.

The kind of limit imposed by the Rule, whether expressed as a percentage of recovery or through a lodestar approach, may well clash with the public policy behind statutory fee-shifting provisions, however, because it would likely preclude individuals seeking to recover relatively small amounts from procuring the assistance of private counsel, other than on a *pro bono publico* basis, and thus would frustrate the very purpose of the statute.  The courts that have either allowed or mandated a lodestar approach have at least tacitly recognized that limits implicit from rules of this kind cannot be rigorously applied when determining what is reasonable under a statutory fee-shifting provision, the predominant purpose of which is to permit the favored suitor to obtain counsel that, because of legal or practical fee limitations, might otherwise be unavailable.

---

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;  and

(8) whether the fee is fixed or contingent."

■ The rule is not inherently in conflict with fee-shifting statutes, however. There are situations in which the two can be in harmony and where appropriate adjustments to a lodestar approach can produce a fee that would be reasonable under both the rule and the statute. Most of the cases applying lodestar have involved the adjustments to be made to a strict hours times rate methodology, and nearly all of the courts have stressed that hours times rate is simply the beginning point. Indeed, the adjustments, up or down, may well produce a result that, in the end, has little relationship to the actual time spent on the case. Whether those adjustments, which are largely case-specific, are denominated as an alternative approach to lodestar or are regarded as embraced within the overall lodestar calculus may well be a matter of semantics.

■ For the reasons explained, and in conformance with what clearly is the predominant rule throughout the country, we conclude that the lodestar approach, with its adjustments, is the presumptively appropriate methodology to be used under the Wage and Hour Law and the Payment Law. We cannot conclude from this record that the trial court used that approach; its remarks were far too ambiguous in that regard. Even if it intended to apply that approach, it gave no real indication of how and why it concluded that a fee equivalent to a 40% share of the recovery was appropriate—why the $57,000 claimed should be reduced to that amount. One of the benefits of the lodestar approach is that it allows the court to make appropriate findings, so that the parties and any reviewing appellate court can follow the reasoning and test the validity of the findings.

■ We shall remand the case for the court to engage in that analysis. Parroting what we said in *Admiral Mortgage, Inc.*, however, in directing that remand, "we do not suggest that the amount of the fee awarded . . . in this case was inappropriate." *Admiral Mortgage, Inc.*, 357 Md. at 553, 745 A.2d at 1036. In addition to the other considerations that are part of the overall lodestar analysis, the court will need to

consider that, with respect to the bonuses, awardable for fee-shifting purposes only under § 3–507.1, the jury made no predicate finding of a lack of a bona fide dispute. It will also need to determine whether the unsuccessful claims—for fraud, for a 5% interest in the practice, Salazar's claims—were truly related to the successful ones and, if not, to disallow all time expended on those claims. In considering the reasonableness of the hourly rates charged by counsel, the court is not bound to any "matrix" adopted by out-of-State courts or agencies but must be guided by the nature of this case and the relevant issues it presented and by the rates or other fee arrangements common in the community for similar kinds of cases. Because the statutes allow only reasonable "counsel fees," the court must exclude any fees of non-lawyers. Charges for paralegals and legal interns are subsumed within the attorney's fees.[4] Finally, the court should consider and give appropriate weight to any fee agreement that may have been made between Friolo and counsel.

JUDGMENT OF CIRCUIT COURT FOR MONTGOMERY COUNTY WITH RESPECT TO ATTORNEYS' FEES VACATED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS IN CONFORMANCE WITH THIS OPINION; COSTS TO BE PAID BY RESPONDENT.

---

4. In this regard, we note that, during the legislative consideration of House Bill 1006, a request was made to allow paralegal fees and it was rejected.