28 A.3d 752

**Joy FRIOLO**

v.

**Douglas FRANKEL, M.D., et al.**

**No. 825, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Sept. 7, 2011.

82

Leizer Z. Goldsmith, Washington, D.C., for appellant.

Matthew J. Focht (Gerard J. Emig, Gleason, Flynn, Emig & Fogleman Chartered, on the brief), Rockville, MD, for appellee.

Panel: MATRICCIANI, WATTS and IRMA S. RAKER (Retired, Specially Assigned), JJ.

MATRICCIANI, J.

On February 4, 2000, appellant, Joy Friolo, filed a complaint in the Circuit Court for Montgomery County against appellees, Douglas Frankel and the Maryland/Virginia Med Trauma Group. On July 3, 2001, the court entered judgment in favor of Friolo in the amount of $11,778.85 and awarded her attorney's fees of $4,711.00 and $1,552.00 in costs. The Court of Appeals vacated the judgment awarding attorney's fees and costs and remanded the case, and on March 18, 2005, the

circuit court entered a second judgment awarding Friolo attorney's fees of $65,348.00. After both parties filed appeals, this Court issued an opinion vacating the judgment and remanding the case for further proceedings in circuit court, and the Court of Appeals affirmed that decision on March 5, 2008. On September 1, 2010, the circuit court entered judgment awarding Friolo attorney's fees of $5,000.00 and $2,277.00 in costs, and in a separate judgment ordered her to pay $7,575.00 for one-half of the special master's fee. Friolo now appeals these last two judgments.

## QUESTIONS PRESENTED

Appellant presents one question for our review:

Whether the circuit court erred as a matter of law or abused its discretion in awarding statutory attorney's fees and costs? [1]

For the reasons set forth below, we enter modified judgment in favor of appellant as authorized by the Maryland Rules of appellate procedure. Md. Rule 8–604(e) ("In reversing or modifying a judgment in whole or in part, the Court may enter an appropriate judgment directly or may order the lower court to do so.").

## FACTUAL AND PROCEDURAL HISTORY

On February 4, 2000, appellant, Joy Friolo, joined by her husband, Victor Salazar, filed suit against appellees, Douglas Frankel and the Maryland/Virginia Med Trauma Group, in the Circuit Court for Montgomery County. The Court of Appeals described their allegations most succinctly in this case's first appeal, *Friolo v. Frankel,* 373 Md. 501, 505–06, 819 A.2d 354 (2003) (*"Friolo I "*):

---

1. Appellant's brief phrased the question thusly:
 Whether the Circuit Court, Hon. Judge Joseph A. Dugan, Jr., committed errors of law in failing to apply the law of the case and other mandatory authorities, and/or abused his discretion, in reaching his Ruling on awarding fees under the applicable statutes?

Friolo and Salazar alleged that, in February, 1998, Dr. Frankel, a physician, hired Friolo as a medical biller, responsible for billing and collections, at a base salary of approximately $30,000. She averred that the practice, at the time, was a "failing venture," that, at some point, Frankel offered all of his employees a percentage interest "in the practice," that she accepted his offer, and that, as a result, she and Frankel agreed that she would get a 5% ownership interest in the medical practice in exchange for her participation in "evaluating and developing the practice." The goal, she said, was to make the practice worth $1 million by the end of 1999, to open four satellite offices within five years, and then to sell the entire practice in 2004. She was to get 5% of the sales price.

Friolo claimed that she worked more than 40 hours a week to maximize the recovery of receivables but that she never received any overtime pay, that she often worked at home on monthly, quarterly, and annual reports but was not paid for that time, and that she and Salazar attended strategic planning meetings and made various recommendations with respect to the practice. Salazar, though not formally employed by Frankel, asserted that he frequently worked on Frankel's behalf by attending marketing meetings, assisting in the preparation of reports, and doing clerical work. Friolo claimed that, as part of her 5% ownership interest, she was to receive, on a monthly basis, 5% of all medical insurance reimbursements and collections received, but that she did not receive full payment of those amounts. Frankel, she said, had agreed to put this arrangement in writing by December 15, 1998, but failed to do so.

Friolo went on bereavement leave from March 9 to March 25, 1999, but worked from March 26 to April 2. On Sunday, April 4, Frankel called her at home, complained that she had been rude to two patients and had not been doing her job properly, and discharged her. . . .

Friolo and Salazar's complaint consisted of ten counts, including breach of express contract, breach of implied con-

tract, unjust enrichment, fraudulent inducement, and violations of the Maryland Wage Payment and Collection Law ("Payment Law"), Maryland Code (1991, 1999 Repl.Vol.), §§ 3–501 *et seq.* of the Labor & Employment Article ("LE"), and the Maryland Wage and Hour Law ("Wage and Hour Law"),[2] LE §§ 3–401 *et seq.*[3]

The complaint requested monetary judgment including $50,000.00 for Friolo's lost interest in the practice, $9,441.00 of unpaid monthly receivable incentives,[4] and $9,070.00 of overtime, as well as $1,030.00 for Salazar's overtime pay, and statutory treble damages for all of these claims. In addition to those $128,164.00 in economic and statutory damages, Friolo and Salazar sought punitive and non-economic damages for the "embarrassment and humiliation" of appellees' alleged fraud. Finally, Friolo and Salazar's complaint sought reasonable statutory attorney's fees. (To that request we shall return, with much to say.)

As their case proceeded in circuit court, Friolo and Salazar whittled down their claims. Approximately five months prior to trial, the parties submitted a joint pretrial statement in which Friolo abandoned her claim to an interest in the practice, and Friolo consented at trial to dismissal of her counts alleging breach of implied contract, unjust enrichment, and fraudulent inducement. Salazar conceded that he failed to

---

**2.** Friolo and Salazar based these claims primarily on LE § 3–505, which at the time of their complaint read as follows:

 Each employer shall pay an employee or the authorized representative of an employee all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated.

**3.** The relevant sections of the Wage and Hour Law, unchanged from the time of appellant's complaint, provide that "each employer shall pay an .overtime wage of at least 1.5 times the usual hourly wage," computed "on the basis of each hour over 40 hours that an employee works during 1 workweek." LE §§ 3–415, 3–420.

**4.** The complaint and pretrial statement included only a partial estimation of this sum, so we have taken the full amount to be that which Friolo demanded at trial.

prove his implied contract and unjust enrichment claims and consented to their dismissal, and the court dismissed his remaining claims for breach of contract and violations of the Wage and Hour Law and the Payment Law. Thus, the only issues submitted to the jury were Friolo's claims for breach of express contract, violation of the Payment Law, and violation of the Wage and Hour Law. The jury found that appellees had failed to pay $6,841.00 in bonuses and $4,937.85 in overtime pay. When asked how much Friolo should be awarded in additional damages that could be "up to three times the amount" of each claim, the jury answered "$0." Accordingly, the court entered judgment in favor of Friolo on July 3, 2001, in the amount of $11,778.85.

After the court entered judgment in her favor, Friolo filed a petition seeking attorney's fees and costs of $69,637.50. At that time, the Wage and Hour Law provided for attorney's fees as follows:

§ 3–427. Action against employer

\* \* \*

(d) *Costs.*—If a court determines that an employee is entitled to recovery in an action under this section, the court may allow against the employer reasonable counsel fees and other costs.

The Payment Law included a similar provision authorizing both attorney's fees and enhanced damages in the same circumstances:

§ 3–507.1. Recovery of unpaid wages

\* \* \*

(b) *Award and costs.*—If, in an action under subsection (a) of this section, a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs.

In her petition, Friolo argued that "[i]n *Admiral Mortgage[, Inc. v. Cooper,* 357 Md. 533, 745 A.2d 1026 (2000) ], the Court

of Appeals strongly suggested that Maryland courts generally follow the law and procedure developed under federal fee-shifting statutes," now well-known as the "lodestar method," which we explore at great length in our discussion, below. Friolo began her proffered lodestar calculation with hourly rates taken not from her contractual fee arrangement, but instead from a matrix used by the U.S. District Court for the District of Columbia in *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354, 371 (D.D.C.1983), *rev'd in part on other grounds*, 740 F.2d 1071, 238 U.S.App. D.C. 400 (D.C.Cir.1984). Friolo thus claimed that her lead counsel Leizer Goldsmith's time should be compensated at the rate of $305.00 per hour, time for his associates Karen Bower and Julie Martin at $250.00 per hour, and law clerk Regina Schowalter at $90.00 per hour. Friolo's petition then addressed the quantity of work performed and referred the court to its attached exhibits of "detailed time records documenting all the work of each attorney in this case based upon the contemporaneous computerized entries of each timekeeper." These time record documents are a ledger in which each line contains an attorney's name, a brief description of his or her task, and an amount of time devoted to that task. Out of several hundred time entries, only a handful are assigned to one or more discrete claims; the remainder do not differentiate among the particular facts or theories to which the work corresponded.

Friolo then explained the general quality and necessity of the work and fees she claimed, as follows:

> The work performed in this case, was necessary to obtain the excellent end result. This civil case included the usual, court appearances, depositions, written discovery and pretrial. Plaintiff's counsel developed their theory of the case, and were able to prevail ultimately at trial even while streamlining their presentation.[5] Ms. Friolo had no choice but to pursue his [sic] claims all the way through a two-day

---

5. We would be remiss if we failed to acknowledge this clever euphemism for dismissed and abandoned claims.

jury trial. Defendant never made any settlement offer even remotely close to the amount of the judgment.

Friolo's petition acknowledged that not all of her claims were successful but maintained that her claims for breach of contract—express and implied—and unjust enrichment were factually and legally identical to her claim under the Payment Law, which went to the jury. Friolo conceded that the fraudulent inducement count "was the only count which she can really have been said to have lost," but she asserted that the time spent on that claim was "negligible, as is illustrated by Plaintiff's decision not to attempt to prove it at trial." [6] Friolo also conceded "that some reduction may be appropriate, to account for her husband's lack of success" because his claims were not related to the others by a "common core of facts." Accordingly, Friolo proffered that "since the unsuccessful claims figured at most in a few hours of preparation and trial, a reduction of no more than ten percent (10%) of the lodestar would amply protect defendants against paying fees for those claims," basing this assertion on her attorney's affidavit testimony to that effect. With that downward adjustment, Friolo maintained that she was entitled to 90% of the lodestar amount and so requested $69,637.50 in fees, plus all costs in the amount of $1,552.15.

Appellees opposed Friolo's petition and argued, first, that the Payment Law only sanctions fees if the court finds that wages were withheld in the absence of a *bona fide* dispute. Second, appellees argued that even if fees and costs were merited, they should be reduced by more than Friolo's ten percent concession because she and Salazar "prevailed on 11.1% of their claims, and were awarded 33.3% of available damages," and because there is no support in Maryland for using the "*Laffey* matrix" to arrive at reasonable compensation rates. Finally, appellees noted that they offered Friolo

---

6. Although our discussion does not require us to evaluate this particular assertion, we should note that, for obvious reasons, Friolo's "decision not to attempt to prove it at trial" does not "illustrate" that the time devoted to it was "negligible."

and Salazar $3,000.00 before trial to settle their claims and proffered that, "[h]ad plaintiffs been willing to negotiate further, perhaps a settlement figure agreeable to both sides could have been reached."

Friolo's reply argued that a *bona fide* dispute removes the possibility of fees under the Payment Law, but its presence could not affect her fee claim under the *Wage and Hour Law* because it is not an element of the latter's text. Friolo also argued that because a *bona fide* dispute was a necessary but insufficient statutory condition of treble damages, the jury verdict denying treble damages did not imply that a *bona fide* dispute existed as a matter of fact. Friolo further argued that the existence of a *bona fide* dispute is a defense that was foreclosed in this case by estoppel and waiver. Finally, Friolo's reply rejected appellees' "statistical analysis" of her success and argued, to the contrary:

> Defendants' contention that Plaintiff's result here is less than excellent is simply without merit. Admittedly, Plaintiff Salazar's claim for a little over $1,000.00 of minimum wage payments was unsuccessful. However, Ms. Friolo asked the jury to return a verdict on bonuses, and she was awarded all the bonuses earned while she was still employed with Defendants. With respect to overtime, she was awarded all the overtime pay she earned that was documented on Defendants' time sheets and authorized directly by Dr. Frankel. Thus, Ms. Friolo proved and won virtually her entire case, and the jury found Defendants liable on all claims submitted to it. This was an excellent victory.

The circuit court convened a hearing on the matter and at its conclusion stated that the court must consider the case's novelty and difficulty and that the award must be "appropriate and fair even when punitive." Without further analysis or elaboration, the court announced its ruling:

> What the Court is going to do by way of award is considering the Load Star [sic] language and the record in this matter, I deem it appropriate to—this case is interesting in looking at the computations awarding 40 percent of

the judgment plus the $1,500.00 in court costs so that comes out to $4,712.00 plus $1,500.00—$6,212.00 is the counsel fees and costs.

The circuit court entered a written order granting Friolo's motion for attorney's fees and costs that directed appellees to pay to Friolo $4,711.00, for attorney's fees, plus $1,552.00 in costs. Friolo appealed that judgment of fees and costs, and the Court of Appeals granted *certiorari* before proceedings in this Court had commenced. Friolo's brief in her first appeal presented the following questions:

1. Whether the lodestar method for calculation of attorneys' fees should be applied in cases under Md.Code § 3–427 and Md.Code § 3–507.1? [7]

2. Whether the trial court's decision not to calculate Friolo's attorneys' fee award by calculating the lodestar and making any necessary adjustments, and to instead award just 40% of the verdict, was clear legal error that must be reviewed by this Court *de novo*, and/or an abuse of discretion, compelling revision of the judgment and/or remand?

The facts set forth in Friolo's brief maintained her position that counsel achieved an "excellent" result for her because, "out of approximately $17,000 in unpaid wages and overtime ever even mentioned by Friolo or her counsel, the jury awarded $11,778.85." Friolo also posited—curiously—that "[a]lthough the relevant statutes permit the jury to award up to three times the actual damages in addition to those actual damages, and Friolo sought and obtained instructions to that effect, *Friolo never claimed any entitlement to such additional damages.*" (Emphasis added.)

Turning to her legal arguments, Friolo maintained that in *Admiral Mortgage*, "the Court of Appeals **strongly suggested** that Maryland courts follow the law and procedure developed under federal fee-shifting statutes when interpreting the attorneys' fees provisions included in the state wage and hour

---

7. It appears that Friolo intended to refer to those sections of the Labor and Employment Article.

laws." (Emphasis in original.) Friolo further argued that "in addition to the ubiquitous federal court precedent, the Court of Appeals had previously applied the lodestar methodology explicitly for cases adjudicated in the Maryland Courts under 42 USC § 1988," citing *Md.-Nat'l Cap. P. & P. Comm'n v. Crawford,* 307 Md. 1, 511 A.2d 1079 (1986). Friolo thus concluded that the circuit court had erred by failing to consider or discuss the lodestar factors set forth in *Hensley v. Eckerhart,* 461 U.S. 424, 430 n. 3, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and by relying instead on "an entirely *irrelevant* factor, awarding fees based on a percentage of the jury's verdict." (Emphasis in original.) Concluding this point, Friolo argued that "settled law holds that fees exceeding the amount of the judgment may nevertheless be reasonable," citing *Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). Friolo then argued that the trial court had implicitly ruled that there was not a *bona fide* dispute over her wages. She contended that the court had "awarded attorneys' fees of forty percent of the verdict under the Wage Payment Law … (in addition to forty percent of the overtime verdict)," which implied that recovery was proper under either—or both—statutes, and that the court therefore *must* have found that no *bona fide* dispute existed. Relying on these arguments, Friolo requested "that the decision of the Circuit Court be revised and amended, that a lodestar calculation be completed, and that she receive the award of attorneys' fees in the amount of $69,637.50, as incurred before and requested from the Circuit Court."

Friolo was joined in her appeal by four *amici curiae,* the D.C. Employment Justice Center, CASA of Maryland, Inc., and the Labor Council for Latin American Advancement, collectively represented by counsel for the Public Justice Center, itself the fourth *amicus curiae.*[8]

The Court of Appeals reported its opinion, cited above, as *Friolo v. Frankel,* 373 Md. 501, 819 A.2d 354 (2003). First,

---

8. These *amici curiae* have also submitted a joint brief in the present appeal.

the Court rejected Friolo's primary argument, stating that "[n]owhere in *Admiral Mortgage* did we 'strongly suggest' that Maryland courts use the lodestar approach, and we certainly did not endorse, or even mention, any 'matrix' adopted by the U.S. Attorney in the District of Columbia, or by anyone else, in applying a lodestar method." 373 Md. at 520, 819 A.2d 354. Nor, the Court continued, did it "adopt a lodestar approach in *Crawford* as a matter of Maryland law and certainly not with respect to the statutes under consideration here." *Id.*

Having established that the lodestar method was not, at that time, a positive matter of Maryland law, the *Friolo I* Court extolled its virtues and noted that, "[f]ollowing the Federal lead, a number of States have also employed the lodestar approach, with its accompanying adjustments, in setting attorneys' fees under fee-shifting statutes." 373 Md. at 527, 819 A.2d 354. The Court concluded that while Friolo was mistaken as to the force of its prior holdings, "the lodestar approach, with its adjustments, is the presumptively appropriate methodology to be used under the Wage and Hour Law and the Payment Law." *Id.* at 529, 819 A.2d 354. At the conclusion of its opinion, the Court explained its decision to remand and provided guidance for further proceedings:

We cannot conclude from this record that the trial court used [the lodestar method]; its remarks were far too ambiguous in that regard. Even if it intended to apply that approach, it gave no real indication of how and why it concluded that a fee equivalent to a 40% share of the recovery was appropriate—why the $57,000 claimed should be reduced to that amount. One of the benefits of the lodestar approach is that it allows the court to make appropriate findings, so that the parties and any reviewing appellate court can follow the reasoning and test the validity of the findings.

We shall remand the case for the court to engage in that analysis. Parroting what we said in *Admiral Mortgage, Inc.,* however, in directing that remand, "we do not suggest that the amount of the fee awarded . . . in this case was

inappropriate." *Admiral Mortgage, Inc.,* 357 Md. at 553, 745 A.2d at 1036.[9] In addition to the other considerations that are part of the overall lodestar analysis, the court will need to consider that, with respect to the bonuses, awardable for fee-shifting purposes only under § 3–507.1, the jury made no predicate finding of a lack of a bona fide dispute. It will also need to determine whether the unsuccessful claims—for fraud, for a 5% interest in the practice, Salazar's claims—were truly related to the successful ones and, if not, to disallow all time expended on those claims. In considering the reasonableness of the hourly rates charged by counsel, the court is not bound to any "matrix" adopted by out-of-State courts or agencies but must be guided by the nature of this case and the relevant issues it presented and by the rates or other fee arrangements common in the community for similar kinds of cases. Because the statutes allow only reasonable "counsel fees," the court must exclude any fees of non-lawyers. Charges for paralegals and legal interns are subsumed within the attorney's fees. Finally, the court should consider and give appropriate weight to any fee agreement that may have been made between Friolo and counsel.

*Id.* at 529–30, 819 A.2d 354 (footnote omitted).

The mandate in *Friolo I* remanding the case to circuit court marked only—to borrow a phrase—the end of the beginning. Upon returning to circuit court, Friolo supplemented her petition to demand an additional $58,172.50 in fees and $1,804.60 in costs for the *Friolo I* appeal and remand. Appellees opposed this supplemental petition, repeating their argument that—as the Court of Appeals had now intimated—Friolo was largely unsuccessful at trial, adding that her appeal was only a *potential* success that depended on the outcome of proceedings on remand. Appellees further argued that the

---

9. We note that this anti-suggestion stands in contrast with the Court's earlier statement that "the amount claimed by Friolo ... appears to us, even under a lodestar approach, *not* to be a *reasonable* fee." 373 Md. at 512, 819 A.2d 354 (emphasis added).

fee-shifting statutes in question should not compensate plaintiffs for appeals that address only attorney's fees and costs, rather than enforcing or protecting their predicate judgment.

The circuit court convened another hearing to address both the original fee petition and its post-appellate supplements. However, the circuit court did not heed the Court of Appeals' admonitions and, on October 21, 2003, it issued an order that gave short shrift to the lodestar method. The circuit court's order included a "discussion" section that consisted only of the following paragraph:

Using the lodestar system, this court determined a judgment of reasonable attorney's fees. The lodestar system calculates a fee by determining the number of hours expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an "initial estimate" of the value of the attorney's services. Hours that are excessive, unnecessary and redundant are excluded from calculation. The trial court may, in its discretion, eliminate specific hours or simply reduce the award to account for the limited success of particular parts of litigation as there is no precise rule or formula for making those determinations.

Without further elaboration, the court stated in its order: [Appellees] shall forthwith pay to [Friolo] and her counsel attorneys' fees in the lodestar amount of $65,348, which was calculated by multiplying [Friolo's] counsel's reasonable hourly rate of ($295 per hour and $200 per hour) by the reasonable number of hours [Friolo's] counsel expended in connection with this matter (194.4 hours at an hourly rate of $295; 35 hours at an hourly rate of $200).[10] This calculation takes into consideration the reasonable hours expended, the complexity of the litigation, the success rate of the

---

**10.** Although there is no explicit indication of how the court arrived at the number of hours to use in its award, its figures match precisely the amount of trial work billed by Friolo's lead counsel and one of his associates. Friolo confirmed this as fact in her motion to alter or amend the judgment.

different parts of the litigation and the uniqueness of the issues.

Neither side was satisfied with this order, and both filed motions to alter or amend that the court denied in late 2003. In January, 2005, Friolo moved to have the court's order reduced to a judgment. On March 18, 2005, a new judge granted Friolo's motion and entered judgment against appellees in the amount of the order, $65,348.00, plus ten percent annual interest from the date of entry.

The circuit court's judgment of March 18, 2005, marked the beginning of another round of appeals, but this time it was *appellees* who initiated proceedings in this Court. Appellees argued that the award was "excessive on its face," that it violated Maryland Rule of Professional Conduct ("MRPC") 1.5, and that the court's ruling was impermissibly vague for failure to apply the lodestar factors mandated by *Friolo I*. Friolo responded to the direct appeal by arguing that the court was not presumptively limited by MRPC 1.5, that the court properly applied the lodestar analysis to the trial stage fee petition, and that the ruling and award were not impermissibly vague.

Friolo filed a limited cross-appeal in which she argued that "[t]he trial court's denial of fees for counsel's successful appellate and post-remand work, and failure to provide any explanation whatsoever for that denial, constitutes an abuse of discretion." Furthermore, she argued that because of her "excellent result" in *Friolo I*, she should be fully compensated for her appellate fees. Appellees responded that the circuit court did not need to explain its decision because "Friolo [was] not entitled to an award of attorneys' fees for appellate advocacy and advocacy on remand that did not result in any tangible benefit to her."

We reported our opinion of these matters as *Frankel v. Friolo*, 170 Md.App. 441, 907 A.2d 363 (2006) ("*Friolo II* "). First, we held that appellees were correct in that the court erred as a matter of law, and we therefore vacated the circuit court's judgment and remanded the case so that the circuit

court could "apply the lodestar analysis and provide a clear explanation of the factors employed in arriving at its award." *Id.* at 451, 907 A.2d 363. Turning to Friolo's cross-appeal, we held that "entitlement to 'reasonable attorneys' fees' under the remedial fee-shifting statutes at issue, LE §§ 3–427 and 3–507.1, does not extend to compensation for appellate and post-remand services where the plaintiff's judgment has been satisfied and the sole issue on appeal is counsel's dissatisfaction with the trial court's fee award." *Id.* at 452, 907 A.2d 363. Concluding the opinion, we expressed our mounting frustration with the course of this litigation:

> In summary, what is before us—and what was before the circuit court—is a garden variety wage and hour claim for unpaid overtime dressed up to appear to be something that it is not. It is a case that might well have fallen within the jurisdiction of the District Court and been prosecuted to success in substantially less time and at substantially less cost. The quality of Friolo's (and Salazar's) claims of fraud, breach of contract, and unjust enrichment were, upon presentation of their evidence, seen to be what they were—efforts to gild the lily and to elevate an overtime wage claim to something more substantial. The suggestion that counsel is entitled to fees in excess of $125,000 in obtaining a judgment of less than $12,000, where the client has been made whole, and where the additional fees have been generated only by counsel's continued litigation of its dissatisfaction with the fee awarded by the circuit court, is untenable. It is, in a word, outrageous.

*Id.* at 456–57, 907 A.2d 363 (footnote omitted).

Friolo petitioned for a writ of *certiorari* to review our decision on the issue of appellate fees. The Court of Appeals granted the petition and issued its decision in *Friolo v. Frankel,* 403 Md. 443, 942 A.2d 1242 (2008) (*"Friolo III"*). In that appeal, Friolo argued that this Court erred because fees should be shifted for appellate work "that resulted in a significant clarification of Maryland law." Second, she repeated the same substantive points that she raised in her original fee petition to argue that her attorneys did not "gild

the lily" and instead achieved an excellent result for her, again dismissing her abandoned claims as "not a major part of the litigation" because they were not included in pretrial statements and were "long since forgotten by five months before the time of trial." [11] Instead, Friolo argued that it was *appellees* who had "baselessly prolonged this litigation at every turn by raising frivolous argument." Finally, Friolo maintained that our ruling "improperly encourages fee awards based on ratios of fees to damages, rather than the lodestar method advocated by [the Court of Appeals] in *Friolo I.*"

After reviewing this case's lengthy procedural history, the *Friolo III* Court agreed with us that the trial court "failed to provide an explanation of how [the lodestar] factors affected the amount of the award, thereby erring as a matter of law." *Friolo III*, 403 Md. at 454–55, 942 A.2d 1242. The Court therefore affirmed our decision to vacate the judgment rendered as part of appellees' direct appeal, but in doing so rejected the restrictions on appellate fees proposed in our disposition of Friolo's cross-appeal. The Court explained that appellate fee awards are justified by the same logic justifying trial fee awards:

> It is as important to compensate counsel for ensuring that the trial court gets it right, even if to do so requires counsel to appeal, as it is to ensure that counsel is compensated for services rendered at trial. Indeed, it is a disincentive to the retention of competent counsel in these kinds of cases to deny recovery for successful appellate advocacy, including advocacy that demonstrates trial court error.

*Id.* at 458, 942 A.2d 1242. The Court therefore held that a fee award should not depend on the appeal's particular relation to the underlying judgment:

> Instead, the degree of success on appeal is a standard more congruent with the purpose of the Wage and Payment Law. Where a plaintiff obtains relief under either of these laws,

---

11. The only record evidence of this timing is that the claims were omitted from a pretrial statement that was *submitted* five months prior to trial.

obtains an award for attorneys' fees incurred while obtaining that relief, and later, on appeal, is successful in procuring an increase in those fees or is successful in correcting a trial court's error, the attorneys' fees incurred during the appeal should be considered as a part of the lodestar analysis required to be conducted on remand and, in that way, be capable of being couped by the plaintiff.

*Id.* at 460, 942 A.2d 1242.

The *Friolo III* Court concluded its opinion by surveying the case and providing general guidance to the circuit court upon remand:

In the instant case, Friolo succeeded in obtaining the initial attorneys' fee award of $4,711, in vacating the judgment in *Friolo I* because this Court agreed with Friolo and held that the lodestar method is the proper analysis by which to determine attorneys' fees under the Wage and Payment Laws, and in obtaining a new, significantly higher fee award, in the amount of $65,348, on remand. While it is in the Circuit Court's discretion ultimately to determine Friolo's degree of success, which will be reflected in the lodestar calculus to determine the appropriate amount of attorneys' fees to award, one of the factors it must consider is the attorneys' fees that contributed to any success that the court determines the plaintiff had. Therefore, on remand, the Circuit Court must include in the lodestar analysis, appellate fees Friolo incurred in successfully challenging, based on the flawed methodology the Circuit Court used, the attorneys' fee awarded in this case. Only in that way will the fee award be consistent with the purpose behind both the Wage and Payment Laws.

403 Md. at 461–62, 942 A.2d 1242.

Having concluded their second round of appeals, the parties returned yet again to circuit court, where a special master [12]

---

12. Judge William J. Rowan, III (Ret.) served as special master for the Circuit Court for Montgomery County in this matter.

heard the matter of fees and costs on October 13, 2009, issuing a report and recommendation on January 25, 2010.

The master's report began its lodestar analysis by noting that appellees had stipulated to the rates of $351.00 per hour for Leizer Goldsmith and $238.00 per hour for his associates Karen Bower and Julie Martin.

Turning to the number of compensable hours, the master first recommended that Friolo not recover fees for her Payment Law claim because "there was no necessary condition precedent finding by the jury under [LE] § 3–507.1, that payment of the $6,841.00 was withheld without a bona fide dispute." The master thus recommended that "roughly 58% of the attorneys' hours expended at the trial court level to recover the total judgment should be discounted in any award of fees at the trial court level." However, the master also recommended that "the same discount should not apply at the appellate level because the appellate hours expended were reasonably the same whether it was a judgment of $4,937.00 or $11,778.00[.]"

The master then undertook a detailed review of each stage of litigation and revised many of Friolo's claimed hours downward. At the trial level, the master found that the trial issues were simple and that two weeks of preparation, including nine hours of mock trial and fifty-one hours to prepare the fee petition, were excessive. The master therefore recommended reducing the trial lodestar for excessive work from $77,608.00 to $45,703.00, and again by fifty-eight percent to $19,195.26 "because Friolo was not entitled to have the attorneys' time considered in the award of the $6,841.00 portion of the judgment." The master then applied each of the factors required by *Friolo I* and found that the award should be further reduced for two related reasons. First, the master noted that "[t]he various Friolo and Salazar cumulative claims suing for $56,000.00 plus punitive damages, are balanced against the recovery of $11,778.00[.]" Then, "keeping in mind the tension between the public policy behind fee-shifting and the limits of

[MRPC] 1.5," the master concluded that the trial fee award should be further reduced to $16,000.00.

Next, the master recommended reducing the appellate lodestar from $309,951.00 to $211,736.00 for "excessive" work,[13] noting that two factors merited further discussion. First, the master found that the case "raised some difficult and unsettled questions of law" and that "[w]hat started out as a 'routine wage case' resulted in complex appellate issues that Friolo's counsel addressed with a high degree of success" that would normally merit an upward adjustment, but that the appellate lodestar amount in this case sufficed. Second, the master found that "[w]hile no client would ever pay $200,000.00 to recover almost $5,000.00, . . . [t]his simply is not a situation that produces a fee reasonable under both the [MRPC 1.5] and the statute," and therefore declined to make any further adjustments to the appellate lodestar.

The master then considered Friolo's demand for $2,277.00 in costs. While the master acknowledged that costs were essentially undisputed, he recommended that the court award Friolo all costs but deduct an equal amount from her fee award because the latter was "very substantial." Finally, the

---

**13.** At the appellate level, the master found that Friolo's counsel expended excessive time in preparation of both the appeal and fee petitions, including:
- Fifteen hours meeting with *amicus curiae* and conducting a moot court argument in *Friolo I*
- Sixty-three hours for brief writing in *Friolo I*
- Seventy-seven hours for a supplemental fee petition on remand from *Friolo I*
- Ninety-eight hours for legal research and writing in *Friolo II*
- One-hundred-forty-nine hours for legal research and writing in *Friolo III*, including forty-five hours for the certiorari petition
- Seventy-five hours of moot court activities in *Friolo III*
- Fifty-five hours preparing supplemental fee petitions on remand from *Friolo III*
- Eleven hours preparing a motion for master's fees after the court had ordered them to be divided equally
- Eighty-three hours preparing a fifty-two page reply brief to appellees' opposition to Friolo's fifth motion for attorney's fees, of which one half reiterated arguments in the motion being opposed
- $4,596.00 in moot court preparation for a three hour motions hearing before the master

master found that Friolo deposited a $3,500.00 retainer "with no delineation between costs and fees" and thus assumed that the deposited funds were for fees. He therefore recommended a further reduction of the lodestar amount to account for that credit. In sum, the master recommended an award of $16,000.00 for trial fees, $205,959.00 in appellate fees, and $2,277.00 in costs.

Friolo and appellees filed a set of exceptions to the master's findings and recommendations, which the circuit court heard and decided on May 20, 2010. The court issued an oral ruling that reviewed the master's report in detail. First, the court held that because there was no indication that Friolo's agreement with her attorneys anticipated rate increases, the applicable hourly rate would be set by their initial retainer agreement at $295.00 per hour for Leizer Goldsmith and $200.00 per hour for his associates Karen Bower and Julie Martin. Second, the court further reduced the recommended amount of compensable hours, adopting the master's reasoning but disagreeing as to what was necessary for the relief granted, thereby arriving at a trial lodestar of $13,580.00.

Having computed a lodestar amount for trial work, the circuit court discussed a variety of factors that it believed justified deviation from that number. First, the court noted that Friolo's success at trial was severely limited relative to the amounts that she and Salazar originally demanded and that "the Court would feel much differently if Ms. Friolo had come in in the first place with her claim set out as it went to the jury, and that Dr. Frankel refused to pay." Second, the court contrasted the present case with one in which "the decision corrects across-the-board discrimination affecting a large class of employees." Third, the court cited to the indications in *Friolo I, II,* and *III,* that the amount of fees Friolo demanded for trial work appeared unreasonably large. Fourth, the court explained its concern that appellees did not possess the financial resources that the fee statute's drafters envisaged. For these reasons, the court recommended that

the lodestar amount be reduced by fifty-eight percent to $5,704.00.[14]

The circuit court next took up the issue of appellate fees, and it again reduced the master's recommended basis. In particular, the court found that significant amounts of time spent on Friolo's fee petitions were excessive because their accounting should have been done in the ordinary course of business, and that her counsel devoted excessive time to its appellate briefs and preparation where the legal issues were largely unchanged from the fee petitions to the appeals, and between *Friolo II* and *Friolo III*. Before announcing its appellate lodestar, the circuit court addressed whether the appeals were successful and noted that the public interest was well-protected by a number of *amici curiae*. The court further found that appellate fees could not be collected from Friolo because there was no agreement to that effect, and that any such agreement would have violated MRPC 1.5 as excessive and would have lacked a notice of liability suggested by *Friolo III*, 403 Md. at 462 n. 14, 942 A.2d 1242,[15] again stressing that no client would agree to such a fee to recover the amount adjudged. To that end, the court stated that it did not "see any way that [Friolo's] retainer agreement reflects anything close to what counsel is asking for in this case or that anybody could agree to do that[,]" and insisted that a litigant "should not be awarded a fee greater than he is contractually

---

**14.** The court thus adopted, for different reasons, the percentage discount the master applied for lack of a finding as to the *bona fide* dispute issue.

**15.** At the end of *Friolo III*, the Court of Appeals noted "one word of caution:"

When an appeal is noted on behalf of the party seeking attorneys' fees but the only significant issue raised in the appeal is the amount of attorneys' fees awarded (or not awarded) by the trial court, there could arise a conflict of interest between the attorney and the client, especially if the appeal is not successful. In that event, unless some other arrangement is made between the lawyer and client, the client, who will be the appellant, will likely bear the cost of the appeal, which may be substantial, even though the principal beneficiary of a successful appeal might be the lawyer. Before agreeing to pursue the appeal, the client should be advised of that prospect.

bound to pay[.]" Finally, the court acknowledged that *Friolo II* vindicated a novel claim, but found that Friolo had all the while pursued an "unreasonable" fee award for trial work and that "[her] success on this limited issue pales in comparison with the defendant's overall success in this case after the trial court's exhaust[ive], reconsideration of lodestar and the other issues." The circuit court then summarized and explained its ruling on appellate fees:

Having said all that, and recognizing that the issue regarding appellate fees was indeed one of first impression and one the plaintiff did win in the Court of Appeals, although with plenty of help from his amicus friends, the Court, if it had to make an award of appellate fees, would find counsel could have done what was required to prepare and argue Friolo 3 in 25 hours. At 295 an hour that's $7,375. However, over one half of the court's opinion was devoted to this Court's insufficient application of lodestar, an issue overwhelmingly won by the defendant in this case.

Therefore, if the Court would have to make an award in this case, I would reduce it by 50 percent and I would award $3,687.50. But in my discretion, and within my analysis of this case, I have determined not to make such an award. I would hope that without going through each of the 12 [lodestar] factors at each billing stage of [MRPC] 1.5, the appellate courts will recognize the analysis is subsumed in the Court's reasoning as set forth in this opinion. I believe that they plug in pretty clearly.

I decline to award even these modified appellate fees, because I'm extremely distressed by what has been at the very least an over-gilding by the plaintiff of their lily. All the while the defendant has had to pay counsel to audit the plaintiff's inflated and unreasonable fees. This is true despite the defendant's far greater success at trial regarding the claims made by the plaintiff that the defendant was forced to defend and win—the reasonable fee imposed by Judge Beard, although not pursuant to lodestar, with which

the plaintiff was dissatisfied, which this Court has increased only slightly.

\* \* \*

This Court is confident that had Ms. Friolo's attorney made a demand at the outset in line with what the jury returned in this case—that is, under $12,000—counsel for the defendant would have been forced to recommend it to his client, and Ms. Friolo could have walked away with her money, probably without the need to even litigate.

The circuit court therefore overruled Friolo's exceptions, sustained appellees' exceptions, and entered judgment against appellees and in favor of Friolo in the amount of $5,000.00 for attorney's fees and $2,277.00 in costs, plus ten percent annual interest. The court also entered separate judgments against Friolo and appellees, ordering each to pay $7,575.00 to the special master for his fees. Friolo noted a timely appeal of these judgments on June 22, 2010.

### DISCUSSION

### I. Introduction

Ordinarily, we might be tempted to begin our discussion of this case with some comparison to a Dickensian plot, but as we near a decade of litigation in it, we will forego such witticisms and proceed directly to the heart of the matter, which is to determine whether the circuit court erred in adjudicating Friolo's petition for attorney's fees.

Thanks to the three prior appellate decisions in this case, we know that where an award is warranted under LE § 3–427(d) or § 3–507.1(b), "the lodestar approach, with its adjustments, is the presumptively appropriate methodology to be used," *Friolo I*, 373 Md. at 529, 819 A.2d 354, and that the method entails the following:

Under the lodestar approach ... the trial court will arrive at a useful starting point by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. As a result, at that starting point, excessive, redundant, or otherwise unnecessary hours should be ex-

cluded, as well as hours that are not properly billed to one's client. An increase or decrease in fee adjustments can then be made, based on consideration of a host of factors.

*Friolo II,* 403 Md. at 453–54, 942 A.2d 1242 (internal quotation marks, alterations, and citations omitted). The "host of factors" to be applied include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill requisite to properly perform the legal service; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount of damages or back pay involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases

*Friolo II,* 403 Md. at 454 n. 8, 942 A.2d 1242 (citing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974)). While there are undoubtedly more factors that could be considered in deciding what is a reasonable fee, this case proceeded under that "standard" set known as the "*Johnson* factors." [16] Importantly, courts have stressed over and again the "degree of success," describing it variously as the "critical" or "crucial" factor in any lodestar analysis. *Friolo III,* 403 Md. at 460, 942 A.2d 1242 (citing *Hensley,* 461 U.S. at 440, 103 S.Ct. 1933).

 We note only one additional item in prelude to our analysis. As the Court of Appeals explained in *Friolo III:*

> [T]he goal of fee-shifting statutes in general is to ensure that individuals, when injured by violations, or threatened

---

**16.** With the exception of "the 'undesirability' of the case" and "awards in similar cases," these factors are the same as those listed in MRPC 1.5(a), which requires that a lawyer's fee be reasonable in consideration of the remaining ten factors. *See Friolo III,* 403 Md. at 456, 942 A.2d 1242 (stating that courts must be "mindful" of MRPC 1.5 (citing *Friolo I,* 373 Md. at 527, 819 A.2d 354)).

violations, of certain laws, have access to legal counsel by a "statutory assurance that [his or her counsel] will be paid a 'reasonable fee[.]' " [*Friolo I,*] 373 Md. at 526, 819 A.2d at 369, quoting *Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986). *See Battaglia v. Clinical Perfusionists,* 338 Md. 352, 364, 658 A.2d 680, 686 (1995) (The purpose of the Maryland Wage and Payment Collection Law is "to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages."). Critical to the achievement of this goal is providing a mechanism, here, the fee shifting statute, and an incentive, based on a realistic expectation of reasonable compensation, for attorneys to agree to take on wage dispute cases, even where the dollar amount of the potential recovery may be relatively small. "Hence, if plaintiffs, such as [Friolo], find it possible to engage a lawyer based on [a fee-shifting statute], the purpose behind the fee-shifting statute has been satisfied." *Delaware Valley,* 478 U.S. at 546, 106 S.Ct. at 3098.

*Friolo II,* 403 Md. at 457–58, 942 A.2d 1242.

The statutes in question are designed to incentivize small claims by providing monetary compensation. Thus, the statutes implicitly adopt some standard economic tenets, including the assumption that plaintiffs will maximize their own wealth—in all its tangible and intangible forms—by choosing actions with the largest expected personal benefits, net of costs,[17] and that information about these costs and benefits is transmitted through prices. As such, these statutes are well-

---

**17.** Our discussion occasionally employs the word "cost" in the general economic sense of a negative consequence or loss that occurs or is required to occur, whether it be a sacrifice of money, time, labor, reputation, or other tangible or intangible goods. *See* "Cost," MERRIAM-WEBSTER ONLINE DICTIONARY (2011), www.merriam-webster.com/dictionary/cost (last visited August 1, 2011) ("the outlay or expenditure (as of effort or sacrifice) made to achieve an object"). In those instances, we are *not* referring to "costs" as commonly and narrowly used (in the plural) to denote "the official fees incurred by the parties in the prosecution and defense of an action at law." "Costs," THE LAW DICTIONARY (Anderson 2002).

suited to economic analysis, which we employ in the discussion that follows.

## II. Analysis

Friolo argues that the circuit court erred in four ways when it ruled on her petition for attorney's fees under LE §§ 3–427(d) and 3–507.1(b). First, Friolo argues that the circuit court abused its discretion in setting the rates of compensation for its lodestar analysis. Second, Friolo argues the circuit court improperly considered what a hypothetical plaintiff would pay for representation in the absence of fee-shifting statutes and, in doing so, erroneously subordinated those statutes to the limitations of MRPC 1.5. Relatedly, and third, Friolo argues that the court erroneously considered her liability to her attorney in determining a reasonable fee award. Fourth, Friolo argues that she was successful at trial and on appeal and that the court erred when it held, instead, that she persisted in bad faith by demanding an unreasonable fee award. Finally, Friolo urges us to decide these matters as ones of law and to enter judgment in her favor rather than prolong this litigation on remand. Our discussion addresses the issues in this same order—that of increasing importance—and concludes that the circuit court erred as a matter of law as to each. Further, because this case resolves to a question of law and our analysis results in a certain proper amount, we shall vacate the existing judgments and enter modified judgment in favor of Friolo. Md. Rule 8–604(e) ("In reversing or modifying a judgment in whole or in part, the Court may enter an appropriate judgment directly or may order the lower court to do so.").

### A. The Hourly Rate

First, Friolo correctly argues that the circuit court abused its discretion in setting the rates for use in the lodestar calculation. Several courts have noted that the lodestar process is complicated by the fact that while it permits various adjustments to the lodestar amount, the mainstay factors "are subsumed within the initial calculation of hours

reasonably expended at a reasonable hourly rate." *Hensley,* 461 U.S. at 434 n. 9, 103 S.Ct. 1933; *Friolo III,* 403 Md. at 454 n. 8, 942 A.2d 1242. In this case, however, that serves to clarify our discussion because the two parts of the "initial calculation"—rate and hours—subsume almost all of the traditional lodestar factors.

The very concept of hourly compensation inherently accounts for preclusion of other employment because it represents the attorney's "opportunity cost" of time and labor.[18] *See Barrow v. Falck,* 977 F.2d 1100, 1105 (7th Cir.1992) ("Judges must stick to the market rate for the attorneys' time-that is to say, the opportunity costs of their time, the rate they could receive in other engagements."); MODERN DICTIONARY FOR THE LEGAL PROFESSION (3d ed.2001) (defining "Opportunity Cost" as "Economic value of a benefit that is foregone when one alternative is selected rather than another"). A reasonable rate fundamentally reflects the attorney's requisite skill, experience, and ability, which the court uses to ascertain comparable and customary fees in the relevant location for similar services.[19] *Blum v. Stenson,* 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ("[T]he burden is on the fee applicant to produce satisfactory evidence ... that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."). Naturally, this evaluation will include the awardee's existing fee agreement and the attorney's agreements with other clients, taking into account the length and nature of those professional relationships. *See Friolo I,* 373 Md. at 522 n. 2, 819 A.2d 354 (under *Johnson,*

---

**18.** Indeed, the value of alternatives to work is the reason an attorney—or anyone else, for that matter—demands compensation at all.

**19.** Presumably, the "experience, reputation, and ability" of the attorney seeking fees will have met the "requisite skill," for otherwise the plaintiff would not have prevailed and could not seek fees in the first place. Thus, this factor appears to be more often a *limit* to prevent parties from hiring "overqualified" counsel. We need not decide how this factor would have affected Friolo's claimed hourly rates because the parties disputed neither.

the "fee agreed to by client is helpful in demonstrating attorney's fee expectations").

Two factors are not inherently bound up in the fundamental existence of the rate, namely the time limitations imposed by the client or the circumstances, as well as the undesirability of the case. In *ex ante* fee negotiations, they would be incorporated into the rate as a premium, but a *ex post* lodestar analysis could equivalently apply that premium to the total amount of trial fees. *See Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 113 F.3d 1089, 1090 (9th Cir.1997) ("A district judge ... may not enhance the lodestar due to undesirability after he inflates the hourly rate to reflect undesirability."). In this case, we need not concern ourselves with that distinction because neither of these two factors, nor any others listed thus far, were in dispute. Rather, the parties in this case *stipulated* to a fee schedule that represented Friolo's attorneys' opportunity cost of time based on their experience and abilities, and neither the record nor the parties arguments provide a reason to depart from those rates. Any adjustments to account for other factors should have been made to the total lodestar amount rather than the stipulated rates, which captured all of the foregoing factors by asking how much Friolo's attorneys could have expected to earn by devoting their time to other matters. For these reasons, the circuit court erred when it strayed from the parties' stipulated rate schedule.

With the parties having stipulated as to rates, there remain five *Johnson* factors for consideration: the time and labor required; the novelty and difficulty of the questions presented; whether the fee was fixed or contingent; awards in similar cases; and the party's degree of success. And again, nearly all of these factors are subsumed by the court's basic lodestar calculation.

A court concludes its lodestar calculation by applying the reasonable hourly rate to "the time and labor required," which is the first remaining factor. Second, the novelty and difficulty of the questions presented sets the attorney's requisite level

of skill and determines the amount of work necessary to prevail, so that it is fully accounted for by the basic lodestar calculation of the reasonable rate and time required. *See Blum*, 465 U.S. at 898–99, 104 S.Ct. 1541.[20] Third, contingency demands a theoretical premium that—like those for time limitations and undesirability—can be applied either to the rate or to the total award; but as we explain below, that factor was not disputed, and regardless of that, the circuit court drew an erroneous inference from the evidence of that factor. Fourth, both before and after the circuit court had calculated a lodestar amount, it failed to appreciate that the unique circumstances of this litigation render comparisons to similar cases practically impossible. Finally, we show that the court's counterfactual reconstruction led it to ignore the presiding judge's determination of the work required and conflate that factor with Friolo's "degree of success."

■ This case thus resolves to a single question: what was Friolo's "degree of success" in light of the fee-shifting statutes' provisions for "reasonable" attorney's fees and costs? While "[t]he reasonableness of attorneys' fees is generally a factual determination within the sound discretion of the trial judge," *Atl. Contr. & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 316, 844 A.2d 460 (2004) (citations and internal quotation marks omitted), that is the "general" case and is not *always* so. The central question in this case depends on our interpretation of LE §§ 3–427 and 3–507.1; therefore, we give due

---

**20.** In *Blum*, the Supreme Court overturned a district court's fee award on this point of law:

> The novelty and complexity of the issues presumably were fully reflected in the number of billable hours recorded by counsel and thus do not warrant an upward adjustment in a fee based on the number of billable hours times reasonable hourly rates. There may be cases, of course, where the experience and special skill of the attorney will require the expenditure of fewer hours than counsel normally would be expected to spend on a particularly novel or complex issue. In those cases, the special skill and experience of counsel should be reflected in the reasonableness of the hourly rates. *Neither complexity nor novelty of the issues, therefore, is an appropriate factor in determining whether to increase the basic [lodestar] fee award.*
>
> 465 U.S. at 898–99, 104 S.Ct. 1541 (emphasis added).

weight to the trial court's particularized findings but answer the ultimate question as one of law. *See Ocean City v. Purnell–Jarvis, Ltd.*, 86 Md.App. 390, 413, 586 A.2d 816 (1991) ("The proper interpretation of a statute is solely a question of law." (citing *Supervisor of Assessments v. Asbury Methodist Home, Inc.*, 313 Md. 614, 626, 547 A.2d 190 (1988))); *see also Willard Packaging Co. v. Javier*, 169 Md.App. 109, 126 n. 12, 899 A.2d 940 (2006).[21]

### B. MRPC 1.5

■ Second, Friolo argues that MRPC 1.5 must be subordinated to the Labor and Employment Article's fee-shifting provisions. One problem with a "holistic" and multi-factor test such as the lodestar method is that it allows conflicting principles to coexist. This, naturally, lends itself to some confusion, as here, where the circuit court misinterpreted the *Friolo I* Court's direction to be "mindful" of the implicit limits of MRPC 1.5:

> The Rule is important to note because it puts a limit on what a lawyer may charge his or her own client. In *Attorney Griev. Comm'n v. Korotki*, 318 Md. 646, 665, 569 A.2d 1224, 1233 (1990), while reserving on whether "there can ever be circumstances justifying a contingent fee in excess of fifty percent," we concluded that "it is generally a

---

21. In *Willard*, we quoted the Supreme Court of Wisconsin's explanation in *Wassenaar v. Panos*, 111 Wis.2d 518, 525, 331 N.W.2d 357 (1983), of the interplay between law and fact in determining "reasonableness" of stipulated contractual damages:

> Whether the facts fulfill the legal standard, here reasonableness, is a determination of law, and ordinarily the appellate court need not defer to the trial court's determination of a question of law. Nevertheless, because the trial court's legal conclusion, that is, whether the clause is reasonable, is so intertwined with the factual finding supporting that conclusion, the appellate court should give weight to the trial court's decision, although the trial court's decision is not controlling.

*Willard*, 169 Md.App. at 126 n. 12, 899 A.2d 940 (internal citations omitted).

violation of the rule for the attorney's stake in the result to exceed the client's stake."

373 Md. at 527, 528, 819 A.2d 354.

The circuit court, however, overlooked the more important guidance from *Friolo I:*

> The kind of limit imposed by the Rule, whether expressed as a percentage of recovery or through a lodestar approach, may well clash with the public policy behind statutory fee-shifting provisions, however, because it would likely preclude individuals seeking to recover relatively small amounts from procuring the assistance of private counsel, other than on a *pro bono publico* basis, and thus would frustrate the very purpose of the statute. The courts that have either allowed or mandated a lodestar approach have at least tacitly recognized that limits implicit from rules of this kind *cannot be rigorously applied* when determining what is reasonable under a statutory fee-shifting provision, the predominant purpose of which is to permit the favored suitor to obtain counsel that, because of legal or practical fee limitations, might otherwise be unavailable.

*Id.* (emphasis added).

The jury award in this case is larger than those noted in *Friolo I* and *Friolo III* as the most common,[22] but there is no reason to believe that fees for larger claims could not also exceed their underlying judgments by large margins. In those cases, it would be contrary to legislative intent—as exhaustively set forth in *Friolo I* and *Friolo III*—to deny recovery of fees that are reasonably necessary to prosecute successful claims under the Labor and Employment Article. As we discussed in *Weichert Co. of Md. v. Faust,* 191 Md.App. 1, 17–20, 989 A.2d 1227 (2010), *aff'd on other grounds, Weic-*

---

**22.** In both cases, the Court of Appeals observed that "[d]uring testimony on the House Bill that ultimately resulted in the Payment Law as it exists today, the 'Executive Director of the Maryland Volunteer Lawyers Service reported that the majority of the claims [under the then-existing Payment Law] were on behalf of low income people and involved between $150 and $200.'" *Friolo III,* 403 Md. at 458 n. 13, 942 A.2d 1242 (quoting *Friolo I,* 373 Md. at 517, 819 A.2d 354).

*hert Co. of Md. v. Faust,* 419 Md. 306, 323, 19 A.3d 393 (2011), the touchstone of fee-shifting statutes is *necessity.*[23] A fee-shifting clause or statute permits the court, with the benefit of hindsight, to compensate a plaintiff for all expenditures without which he or she would not have succeeded. Thus, if a plaintiff could have recovered only a one-thousand dollar verdict by virtue of one-hundred-thousand dollars worth of legal work, full compensation requires that those fees be shifted, regardless of their magnitude relative to the verdict.[24]

---

**23.** In *Weichert,* we did not explicitly state the obvious but important principle that courts and legislatures generally define "reasonable" fees in terms of what is "required," which is simply a synonym of "necessary." *See Johnson,* 488 F.2d at 717 (establishing as a lodestar factor "the time and labor required"). *See also Barnes v. Rosenthal Toyota, Inc.,* 126 Md.App. 97, 103–04, 727 A.2d 431 (1999) (upholding decision not to award fees under statutory provision for "reasonable attorney's fees" where trial court found that work unrelated to successful claim was "not reasonably necessary"); *Int'l Sec. Life Ins. Co. v. Finck,* 496 S.W.2d 544, 546–47 (Tex.1973) ("As a general rule, in a case involving more than one claim, attorney fees can be awarded only for *necessary* legal services rendered in connection with the claims for which recovery is authorized." (emphasis added)); Md.Code (1984, 2006 Repl.Vol.), § 7–107(b) of the Family Law Article (authorizing award of "an amount for the reasonable and *necessary* expense of prosecuting or defending the proceeding" (emphasis added)).

**24.** *See Riverside,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (upholding $245,456.25 in attorney's fees to prevailing civil rights plaintiffs on $33,350.00 in damages.); *Loggins v. Delo,* 999 F.2d 364, 368 (8th Cir.1993) (upholding award of $25,000.00 in fees for $102.50 in actual damages); *United States Football League v. National Football League,* 887 F.2d 408, 412–13 (2d Cir.1989) (awarding $5,529,247.25 in attorneys' fees and $62,220.92 in costs for antitrust jury verdict of $3.00); *Perez v. Perkiss,* 742 F.Supp. 883, 890–91 (D.Del.1990) (awarding $10,110.00 in fees for $200.00 in actual damages and $1000.00 in statutory damages); *Smith v. Chapman,* 436 F.Supp. 58, 66 (W.D.Tex. 1977) (awarding $3,500.00 in fees for $995.00 in damages); *Fleetwood Motor Homes of Pennsylvania, Inc. v. McGehee,* 182 Ga.App. 151, 355 S.E.2d 73, 74–75 (1987) (upholding fee award of $15,000 for $1,500 judgment). *See also Niederer v. Ferreira,* 189 Cal.App.3d 1485, 1508, 234 Cal.Rptr. 779 (Cal.Ct.App.1987) (citing *Riverside v. Rivera* as "reject[ing] the notion that the fee award must be proportionate to the amount of damages recovered"); *Jordan v. Transnational Motors, Inc.,* 212 Mich.App. 94, 98–99, 537 N.W.2d 471 (Mich.Ct.App.1995) ("If courts focus only on the dollar value and the result of the case when awarding attorney fees, the remedial purposes of the statutes in question will be thwarted."); *General Motors Acceptance Corp. v. Jankowitz,*

We emphasize—for reasons that we make clear below—that this logic and legislative intent extends only to *reasonably necessary* fees and costs of *successful* claims. And while the circuit court considered both necessity and success in this case, its ruling was dominated by considerations of what a hypothetical plaintiff would willingly pay to recover the judgment in this case, which was antithetical to legislative intent and an error of law.

## C. Contingency

■ Third, Friolo argues that the circuit court erred when it considered whether she agreed to conditional or unconditional liability to counsel for fees, and we agree. In *Friolo I,* 373 Md. at 526, 819 A.2d 354, the Court of Appeals acknowledged that the Supreme Court's decision in *City of Burlington v. Dague,* 505 U.S. 557, 561, 567, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), held that a contingency lodestar "enhancement" is not permitted under a "typical" federal fee-shifting statute. While there is Maryland authority dealing with "pure" contingency agreements, *see Holzman v. Fiola Blum, Inc.,* 125 Md.App. 602, 636–642, 726 A.2d 818 (1999) (agreement to pay one-third of judgment fee must be considered within general reasonableness analysis), there is no case law dealing with the issue in the lodestar context.

■ While this case does not call for us either to adopt or to reject the reasoning and holding in *Burlington,* it does require of us a related holding that unconditional liability to counsel should not be a prerequisite to a fee award for two reasons. First, counsel is often in a better position than a

230 N.J.Super. 555, 562, 553 A.2d 1380 (App.Div.1989) ("[A] New Jersey court should not limit flatly those fees to a maximum dictated only by the dollar amount of recovery."); *Bittner v. Tri–County Toyota, Inc.,* 58 Ohio St.3d 143, 569 N.E.2d 464, 466 (1991) (rejecting argument that the amount of attorney fees awarded pursuant to Ohio consumer protection law "must bear a direct relationship to the dollar amount of the settlement, between the consumer and the supplier"); *Dixie State Bank v. Bracken,* 764 P.2d 985, 990 (Utah 1988) ("in a lawyer's life . . . it takes about the same amount of time to collect a note in the amount of $1,000 as it takes to collect a note for $100,000").

litigant to both judge and to bear the risk of loss and so may arrange for a contingent fee. *See* Rowe, *The Legal Theory of Attorney Fee Shifting: A Critical Overview*, 1982 Duke L.J. 651, 676 ("If we want to encourage private attorney general suits, risky plaintiffs' test litigation, or claims for nonmonetary relief, forbidding the shifting of compensation for risk could deter the bringing of such cases."), *cited in Pa. v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 721 n. 8, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (plurality opinion). This sort of arrangement is particularly valuable in a suit such as this wage dispute, where fees are shifted because the plaintiff presumably lacks capital to fund a risky lawsuit. Second, and more importantly, the Court of Appeals expressed its concern in *Friolo III* that "[w]hen an appeal is noted on behalf of the party seeking attorneys' fees but the only significant issue raised in the appeal is the amount of attorneys' fees awarded (or not awarded) by the trial court, there could arise a conflict of interest between the attorney and the client, especially if the appeal is not successful." 403 Md. at 462 n. 14, 942 A.2d 1242. Specifically, the conflict in that situation stems from the fact that the attorney will be compensated regardless of the appellate outcome (either by the opposition, if successful, or by the client, if unsuccessful). A contingent fee agreement removes that conflict by tying compensation to success. Thus, while it may appear that a contingent agreement sets the client adrift while the attorney prosecutes the case without consequence, in truth it lashes the attorney to the proverbial mast and provides a "negative incentive" for failure, thus helping to ensure that counsel will act in the client's best interest.

If a complainant could only recover fees where he or she has accepted unqualified liability to counsel, it would deprive the plaintiff of both of these benefits and deter precisely the type of suits that our fee-shifting statutes are designed to encourage. If contingency was to be considered at all, it should have been used to determine whether the rate included an appropriate premium. *See City of Burlington v. Dague*, 505 U.S. 557, 567, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (Blackmun, J.,

dissenting) ("[I]t is a fact of the market that an attorney who is paid only when his client prevails will tend to charge a higher fee than one who is paid regardless of outcome[.]" (citing R. Posner, Economic Analysis of Law § 21.9, pp. 534–535 (3d ed.1986))). For these reasons, limits on a client's liability, whether fixed or contingent, do not make fee award demands exceeding that limit "unreasonable" under the fee-shifting statutes in question, and the court erred as a matter of law when it held otherwise.

## D. Degree of Success

██ The fee-shifting statutes in this case, like most, award fees only to a prevailing party. *See* LE § 3–427(d) (court may award fees only if employee is "entitled to recovery" of wages under that section); LE § 3–507.1(b) (court may award fees only if the "employer withheld the wage of an employee" in violation of the subtitle). And while the opposite result—abject failure—is easily identified by a judgment in favor of the defendant, it takes a considerable effort to determine whether a plaintiff has "prevailed" in two common scenarios. First, a plaintiff may be successful on only a subset of his or her claims asserted, in which case the court will award fees for work if, and only if, it was reasonably necessary to prosecute those claims that resulted in an award, denying recovery only for work that did not contribute in any way to the plaintiff's success. *See Reisterstown Plaza Assoc. v. General Nutrition Center, Inc.,* 89 Md.App. 232, 245, 597 A.2d 1049 (1991) (a party may recover attorney fees rendered in connection with all claims if they arise out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts); *see also Weichert,* 191 Md.App. at 15–20, 989 A.2d 1227 (discussing practical and theoretical limitations of the "common core of facts" doctrine). Second, the judgment may not encapsulate the litigation's true value to society, such as injunctive relief affecting a broad category of potential plaintiffs, or resolution by extra-judicial settlement. *See Johnson,* 488 F.2d at 718 ("If the decision corrects across-the-board discrimination affecting a large class

of an employer's employees, the attorney's fee award should reflect the relief granted."), *accord, Blum,* 465 U.S. at 900, 104 S.Ct. 1541; *Friolo I,* 373 Md. at 522 n. 2, 819 A.2d 354 (same); *Blaylock v. Johns Hopkins Fed. Credit Union,* 152 Md.App. 338, 355, 831 A.2d 1120 (2003) ("[U]nder the Consumer Protection Act, a consumer who achieves victory by means of an agreement approved by the court is entitled to attorney's fees, even though no consent decree or judgment is entered in favor of the prevailing party."). *See also Hensley,* 461 U.S. at 446 n. 4, 103 S.Ct. 1933 ("[I]n enacting [42 U.S.C.] § 1988, Congress determined that the public as a whole has an interest in the vindication of the rights conferred by the statutes enumerated in § 1988, over and above the value of a civil rights remedy to a particular plaintiff."). This case presents neither of these two difficulties. The trial merely resolved a minor dispute between a physician and his former employees and did not affect a broad base of potential litigants[25] and Friolo stipulated to an appropriate reduction for her unsuccessful claims.[26] Instead, this case requires that we define the plaintiff's "degree of success" where an otherwise inconsequential suit resulted in a judgment awarding only a fraction of the damages claimed.

---

**25.** We shall see, below, that while the parties' appeals did produce a widespread change in the law, that success must be considered separately from success on the specific factual merits of the case.

**26.** Friolo stipulated that ten percent of the work at trial was entirely unrelated to the claims that produced some judgment for her, and the record gives no indication to the contrary. Friolo abandoned her fraud claims during the discovery process and well in advance of trial, and to the extent that the pretrial work involved Salazar's claims, they were factually and legally related to Friolo's successful claims. Further, Friolo's dismissed claims were only nominal losses, as they were redundant legal theories supporting the successful Wage and Hour and Payment Law claims.

. We note that Friolo's successful claims could be distinguished according to whether they related to overtime versus unpaid wages. Setting aside the difficulties of separating an attorney's work on closely related issues as discussed in *Weichert,* 191 Md.App. at 15–20, 989 A.2d 1227, we shall see that this potential factual distinction is immaterial because Friolo's claims, considered separately, were each only partially successful.

The circuit court dealt with the discrepancy between Friolo's claims and the jury's award by estimating the amount of time it believed was appropriate to obtain a judgment of $11,778.85, but that was not the correct approach under these circumstances. While the court may have correctly assumed that a certain amount of work *generally* correlates with the size of the judgment, we have already established that there is no necessary or constant relation between the size of a judgment and the size of a proper fee award. This is particularly true in cases such as this employment dispute where one side generally has a greater precedential interest than the other or can bring more resources to bear in litigation. *See Mirabal v. General Motors Acceptance Corp.*, 576 F.2d 729, 731 (7th Cir.1978) (opposition's fees not informative in lodestar analysis due to disparate precedential interests), *accord Migis v. Pearle Vision*, 135 F.3d 1041 (5th Cir.1998), *Henson v. Columbus Bank & Trust Co.*, 770 F.2d 1566, 1574–75 (11th Cir.1985). Thus, the court could not simply reduce the fees claimed to align with those in other cases that are identical *only in the amount of their judgments*, and the circuit court erred when it ignored the presiding judge's findings and instead estimated what quantity of work was commensurate with the jury's award.

Although we have identified the locus of the court's error, there remains an important and insidious problem in determining Friolo's "degree of success." Even if we adopt the presiding trial judge's conclusion that all the work for which Friolo sought compensation was *related* to her successful claims in law or in fact, we can only deem that labor "necessary" under the circumstances. Crucially, those circumstances include the fact that Friolo demanded some $60,000.00 more than the jury determined she was entitled to recover. Hence, the presiding judge initially—and in some sense correctly—deemed the labor "necessary," but only in the narrow context of the trial. In the broader context that the fee-shifting statutes address, "necessity" must account for the fact that excessive demands cause unnecessary litigation. *See Brooms v. Regal Tube Co.*, 881 F.2d 412, 425 (7th Cir.1989)

(remanding for district court to consider whether plaintiff "unduly prolonged" the litigation "with no hope of greater recovery" by refusing settlement offer "for an amount nearly equalling what she eventually received at trial"); *Vocca v. Playboy Hotel of Chicago, Inc.*, 686 F.2d 605, 608 (7th Cir. 1982) ("Counsel's refusal to settle the case earlier for an amount only slightly less than the amount ultimately agreed upon, accompanied by his statement that Playboy could afford to pay more, provide sufficient support for the district court's conclusion that he had unreasonably prolonged the litigation."); *EEOC v. Nutri/System, Inc.*, 685 F.Supp. 568, 577–78 (E.D.Va.1988) ("Even where questionable claims are not involved, it is a salutary principle that a prevailing party should not be permitted to inflate a fee award by using unreasonable settlement demands to extend a case.").

Our aim, then, is to determine what would have been necessary in order for Friolo to extract her rightful damages from appellees had she not demanded several times that amount in her complaint, and both the fee-shifting statutes and eighth *Johnson* factor provide us with a target—the fact-finder's award. If a fact-finder awards only *part* of a *single* claim, then the verdict effectively severs a plaintiff's claims into two portions, one with merit and one without. Thus, legislative intent to incentivize only meritorious claims implies that our definition of "success" should be limited to the successful part, and we must consider the size of the judgment *relative to the size of the plaintiff's demands.* This is, in essence, a concentrated application of the eighth *Johnson* factor, "the *amount involved* and the *results obtained.*" [27] *See Nigh v. Koons Buick Pontiac GMC, Inc.*, 478 F.3d 183, 190 (4th Cir.2007) (the requirement "to weigh the amount in controversy and the results obtained before deciding upon a reasonable fee … rests on the idea that a prevailing plaintiff is less worthy of a fee award when one or more of his claims

---

27. In *Friolo III*, the Court of Appeals rephrased the eighth *Johnson* factor to match the circumstances of the employment dispute, describing the amount in controversy as "the amount of damages or back pay involved." 403 Md. at 454 n. 8, 942 A.2d 1242.

lack merit—that is, *when he cannot demonstrate that he deserves the compensation he demanded in his complaint.*" (emphasis added)).

Importantly, this logic of incentives extends beyond the simple case of a "stone-walling" defendant who refuses to pay any damages at all. Litigation cannot be considered a "success" if it results in no recovery beyond what the defendant was willing to admit, which compels us to consider the defendant who tenders *settlement.* If a plaintiff demands $100,000.00 while the defendant offers to settle for $50,000.00, only to have the jury award the settlement of $50,000.00, the value of that litigation is the same as if the plaintiff had demanded $50,000.00, only to be offered and awarded $0.00. In either case, the value of the litigation is zero because the proper "baseline" to measure success is the defendant's willingness to pay, which is the approach taken by Federal Rule of Civil Procedure 68. Federal Rule 54(d) awards of costs—and where designated by statute, attorney's fees—to the prevailing party by default, but Rule 68 allows a defendant to "serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued." Fed.R.Civ.P. 68(a), (c); *Marek v. Chesny,* 473 U.S. 1, 9, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985) ("[A]bsent congressional expressions to the contrary, where the underlying statute defines 'costs' to include attorney's fees, we are satisfied such fees are to be included as costs for purposes of Rule 68."). The defendant's settlement offer then sets the measure of success, so that "[i]f the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made." Fed.R.Civ.P. 68(d). As noted, above, the plain texts of LE §§ 3–427(d) and 3–507.1(b) condition fee awards on recovery. Those statutes do not, however, *require* a fee award wherever the plaintiff recovers, and it would be unreasonable to award fees where the defendant tenders the plaintiff's entitlement but the plaintiff refuses to accept that offer and seeks an unjustified amount. *See Sands v. Runyon,* 28 F.3d 1323, 1334 (2d Cir.1994) (in determining attorney's fee award, court may consider that defendant's "offer was strikingly similar to the

court's eventual judgment"); *Cormier v. Manke,* 108 Nev. 316, 317–18, 830 P.2d 1327 (1992) ("[W]hen considering a motion for attorney's fees pursuant to NRS 18.010(2)(a) in a case in which a non-statutory offer of settlement has been rejected, the district court must consider the reasonableness of the rejection."); *Brooms,* 881 F.2d at 425; *Vocca,* 686 F.2d at 608; *EEOC v. Nutri/System, Inc.,* 685 F.Supp. at 577–78.

We recognize, however, that it takes two parties to litigate, and a defendant might just as easily offer $0.00 as $50,000.00 to settle a claim that ultimately produces a $50,000.00 verdict. Thus, we also must account for the fact that a defendant's settlement offer can fall *below* the jury's verdict, thereby justifying litigation. But as with the plaintiff's overreaching, a defendant's failure to offer settlement can be in full *or in part.* In the simple case, a defendant may offer $0.00 only to have a verdict entered in favor of the plaintiff for the entirety of the claims. If, however, a plaintiff demands $100,000.00 and obtains a judgment of $50,000.00 against a defendant who never offered any settlement—which is to say the defendant "offered" $0.00—both parties will have contributed equally to litigation costs.

For these reasons, legislative intent demands that the lodestar amount in this case be reduced by Friolo's *relative* contribution to causing unnecessary litigation, taking into account both her *overstatement* of damages *and appellees' understatement* of damages, as measured by the verdict.[28] Where, as here, the plaintiff sought only monetary damages, the relative contribution of each party to "causing" litigation

---

**28.** The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.S. § 1400 *et seq.,* also employs a comparative approach to attorney's fees, allowing the court to reduce its award where "the parent, or the parent's attorney, during the course of the action or proceeding, ·unreasonably protracted the final resolution of the controversy[,]" *unless* the court *also* finds that *"the State or local educational agency unreasonably protracted the final resolution of the action* or proceeding or there was a violation of this section[.]" 20 U.S.C.S. § 1415(i)(3)(F)(i), 1415(i)(3)(G) (emphasis added). *See also El Paso Indep. Sch. Dist. v. Richard R.,* 591 F.3d 417, 424 (5th Cir.2009) ("[T]he D.C. Circuit and the Third Circuit ... recognized that the IDEA contemplates reducing fees when a litigant rejects a settlement offer

can be expressed with straightforward arithmetic by multiplying the lodestar amount by a fraction that is the difference between the judgment and the settlement offer, divided by the difference between the claims and the settlement offer.[29] Under this relative approach, Friolo would have recovered all of the fees she incurred had her claims been fully vindicated, whereas if had she recovered nothing beyond the defendant's settlement offer, she would have received no fee award. Additionally, like Federal Rule 68, our interpretation of the prevailing party's "degree of success" offers the benefit of encouraging settlement by discouraging either side from causing unnecessary litigation. *See Delta Air Lines v. August,* 450 U.S. 346, 352, 101 S.Ct. 1146, 67 L.Ed.2d 287 (1981) ("Rule 68 provides an additional inducement to settle in those cases in which there is a strong probability that the plaintiff will obtain a judgment but the amount of recovery is uncertain.").

■ As it happened, Friolo demanded $78,164.00 in damages at trial,[30] while appellees offered $3,000.00,[31] and the jury awarded $11,778.85. Using our formula, Friolo's demands

and does not achieve more favorable relief tha[n] what was offered, but that the litigant remains the prevailing party.").

29. This can be expressed more easily in mathematical notation. If we let "C" stand for the amount of a plaintiff's claims, "S" stand for the amount of a defendant's settlement offer, and "J" stand for the amount of the judgment, then the plaintiff's fees should be *reduced* by the amount $(C-J)/(C-S)$. In order to simplify that reduction, we can use the fact that this number will always sum to one with its complement, $(J-S)/(C-S)$. Therefore, instead of subtracting the plaintiff's contribution from one, we can simply multiply the lodestar by that complementary fraction, which represents the defendant's relative contribution to litigation costs.

 We note that this approach is limited by LE §§ 3–427(d) and 3–507.1(b) to operate only in favor of a plaintiff and could not be used to justify an award in favor of a defendant. Federal Rule 68 is similarly restricted, but for different reasons. *Delta Air Lines,* 450 U.S. at 352, 101 S.Ct. 1146 ("Because costs are usually assessed against the losing party [under F.R.C.P. 54(d) ], . . . Rule 68 would provide little, if any, additional incentive if it were applied when the plaintiff loses.").

30. As noted, above, we exclude Friolo's $50,000.00 fraud claim that she abandoned prior to trial, as well as her claims for punitive and non-economic damages, as they were abandoned with the fraud claim.

exceeded the judgment by $66,385.15, while appellees' offer to settle fell short by $8,778.85. Thus, out of the $75,164.00 disagreement between the two parties, Friolo was responsible for eighty-eight percent of the difference.[32] Had Friolo been completely successful, she would have been entitled to the entire $69,637.50 lodestar amount. Under the circumstances, however, Friolo's degree of success relative to her claims and appellees' parallel—but lesser—contribution to litigation reduced her entitlement to statutory attorney's fees by eighty-eight percent, for a legally proper statutory award of $8,356.50 in fees for the trial stage of litigation.

The question of *appellate* fees is complicated by the fact that much of the benefit—and hence the success—obtained on appeal is public rather than specific to the litigant. Upon closer examination, however, the situation at hand is not as complex as it might appear, and we can continue to apply the same reasoning. In her appeals, Friolo successfully established two points of law, namely that Maryland courts should employ the lodestar method and that the fee-shifting statutes allow what courts have called "fees-on-fees" for appellate work. Where, as here, unclear law impeded the plaintiff, the public naturally benefits from the judicial opinion clarifying that point of law. More importantly, because that benefit is purely a product of litigation, its cost will be *fully compensated* by shifting the plaintiff's attorney's fees.[33]

---

**31.** Appellees' settlement is only relevant to the issue of statutory fees and costs. Under Maryland Rule 5–408, it would have been inadmissible "to prove the validity, invalidity, or amount of" appellant's claims. *See also* Fed.R.Civ.P. 68 ("Evidence of an unaccepted offer is not admissible except in a proceeding to determine costs."); Federal Rule of Evidence 408 (evidence of compromise inadmissible "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction").

**32.** Appellees were therefore responsible for the remaining twelve percent difference that corresponds by arithmetical necessity to the amount that Friolo is entitled to recover.

**33.** Our solution would not be so simple if recoverable attorney's fees were limited to some multiple of the judgment, which might deter a

We recognize the potential argument that a plaintiff should be rewarded for public benefit independent of private reward, and that Friolo's success should not be discounted simply because her personal claims failed. That could be the correct result in another case, but here it would foist a gross public burden on a private defendant in a manner antithetical to both the fee-shifting statutes and—as this case demonstrates—to the realities of the litigation undergirding them. We have already established that a *fully successful* plaintiff will be *fully compensated* for his or her costs and thus will incur no loss for pursuing the public benefit in the course of obtaining relief. On the other hand, it is erroneous to assume that where public and private benefits diverge we can properly incentivize a private plaintiff who would bear the risk of loss without the possibility of private gain. For confirmation of this, we need look no farther than the facts of this case. *Friolo I* established that the public interest demands the lodestar methodology. On remand, the circuit court awarded Friolo the full amount of trial fees she demanded without employing a proper lodestar analysis, but Friolo lodged no complaint. Instead, it was *appellees* who successfully reversed that award for failure to employ lodestar, Friolo having abandoned the public interest once she stood to gain nothing from pursuing it in court and leaving the matter for the next plaintiff.[34] We therefore have no reason to depart from the overarching legislative intent to deny attorney's fee awards to an unsuccessful plain-

---

plaintiff from pursuing his or her claims in full, but *Friolo III* unequivocally rejected that possibility, as do we (in what we suppose will be known as *Friolo IV*). As such, a *completely successful* plaintiff will be fully compensated for his or her contribution to the public through "ordinary" fee-shifting, regardless of how much it cost to do so.

**34.** Notably, had appellees not disputed and lost the issue of appellate fees in *Friolo II* and *Friolo III*, it is *they* who would have stood as the successful parties shouldering the public's burden by demanding a thorough and documented lodestar analysis.

We would add, however, that we do not blame appellant for her actions because she was under no obligation to pursue the public interest at her own expense. We note only that Friolo's continued attempts to paint herself and her counsel as crusaders of the public good are pretensions, at best.

tiff, and we treat Friolo's appeal simply as a new action with its own "claims" that are subject to the foregoing analysis to determine their degrees of success.[35]

In *Friolo I*, appellant claimed she was entitled to $69,637.50 in fees, while appellees maintained that she should not be awarded any fees at all. Neither of these figures reflected the proper award, which we determined above, of $8,356.50. Thus, the *appeal itself* was another partial success, and while Friolo demanded $85,745.58 in her petitions for appellate fees,[36] her relative contribution to prolonging these proceedings only entitles her to a portion of that amount. Thus, we again apply our formula to Friolo's appellate fee petitions and arrive at a proper award of $10,289.47 for fees incurred in connection with *Friolo I*.[37] Finally, we can iterate our analysis and apply it again to both *Friolo II* and *Friolo III*. In those proceedings, Friolo sought a total of $163,353.83 in fees for prior work,[38] whereas the results of that work justified only $18,645.97 in attorney's fees.[39] Friolo now seeks $219,963.34

---

**35.** There is one noteworthy distinction between trial and appellate work. A trial will often involve a variety of possibly unrelated claims, whereas an appeal will most often present a unified front of related legal theories. Thus, while there could be room to discern successful from unsuccessful *arguments* within an appeal, they will generally be so closely related that they deserve compensation as a whole, particularly where the state of the law is unclear and competent advocacy demands a comprehensive set of alternative arguments.

**36.** Our figures differ slightly from those presented in the conclusion of Friolo's sixth and final supplemental fee petition. We derived these amounts by multiplying the time Friolo claimed throughout her petition by the stipulated rates and therefore consider our figures to be more accurate than those in Friolo's tabular summaries, which are replete with arithmetical errors.

**37.** Friolo's claim to $69,637.50 in fees represented eighty-eight percent of the parties' total departure from the deserved amount of $8,356.50, and reducing $85,745.58 by that percentage yields $10,289.47.

**38.** In addition to the $85,745.58 in appellate fees given above, Friolo increased her demand for trial fees from $69,637.50 to $77,608.25.

**39.** This is the sum of the two foregoing awards: $8,356.50 for trial and $10,289.47 for *Friolo I*.

for her counsel's work in *Friolo II, Friolo III* (and the most recent remand), but her relative contribution to—and limited success in—those proceedings justifies only twelve percent of that amount, $26,395.60.

The unusual circumstances of this case isolated Friolo's degree of success as *the* deciding factor. The parties did not dispute the reasonable rate of compensation, and the presiding judge determined that her counsel's work was commensurate with the breadth and size of appellant's claims, but not her success relative to those claims. The circuit court's attempts to reconcile her fees and success were improper in light of the legislative intent underlying LE §§ 3–427(d) and 3–507.1(b). Instead, those statutes require us to balance the parties' incentives and account for each side's relative contribution to causing unnecessary litigation. Had Friolo sought only what she deserved, there may have been no need for litigation at all, and had she recovered all she claimed, she would have been entitled to whatever amount of fees that required. As it was, while the work claimed was necessary under the limited circumstances of trial, Friolo's overreaching contributed considerably to the costs of this litigation, and her degree of success merited only $8,356.50 in trial fees, $10,289.47 for fees in *Friolo I,* and $26,395.60 for *Friolo II* and *Friolo II,* for a total of $45,041.57.

Before we conclude our discussion of Friolo's degree of success, we should specifically address the scope of our holding. In *Hensley,* the Supreme Court opined that "[t]here is no precise rule or formula" for determining a party's "degree of success," 461 U.S. at 436–37, 103 S.Ct. 1933. We do not disagree, and we do not intend for our formulaic approach in this particular case to stand as a universal and exclusive rule that determines a plaintiff's "degree of success" to the exclusion of all other considerations. Our mandate rests on a formulaic approach because a decade of litigation has distilled the issue to an unusually pure form, that being economic damages divorced from any dispute over the other *Johnson* factors and from other considerations on the narrow issue of success, such as failed but unrelated claims or a broad societal

benefit. We hope that, in the same way the lodestar calcula-
tion serves as a starting point to determine "reasonable" fees,
our formula might prove to be a useful *starting point* where
individual claims are partially successful, providing some guid-
ance beyond the *Hensley* Court's broad suggestion to "simply
reduce the award to account for the limited success."

### E. Other Matters

#### 1. Bona Fide Dispute

 Appellant argues that the existence of a *bona fide*
dispute is an affirmative defense to the Payment Law's en-
hanced damages and attorney's fees provisions, and that ap-
pellees waived that defense by failing to include it in their
answer.[40] Maryland Rule 2–323(a) requires that, with the
exception of certain preliminary defenses,[41] "[e]very defense of
law or fact to a claim for relief in a complaint, counterclaim,
cross-claim, or third-party claim shall be asserted in an an-
swer[.]" Ordinarily, a defense is a specific denial that must be
disclosed under Rule 2–323(c):

> Except as permitted by section (d) of this Rule, a party shall
> admit or deny the averments upon which the adverse party
> relies. A party without knowledge or information sufficient
> to form a belief as to the truth of an averment shall so state
> and this has the effect of a denial. Denials shall fairly meet
> the substance of the averments denied. A party may deny
> designated averments or paragraphs or may generally deny

---

**40.** At the conclusion of *Friolo III*, the Court of Appeals stated:
> Whether Friolo is entitled to an attorneys' fee award under the
> Payment Law, however, is questionable, as the jury did not conclude
> that Frankel's failure to pay back wages was not due to a *bona fide*
> dispute and denied enhanced damages, and is a matter for the Circuit
> Court to determine on remand, as part of its analysis under the
> lodestar approach.
403 Md. at 457. The Court's opinion did not, however, address the
issue of whether the issue had been properly *pled*, and its direction to
the circuit court thus stands as *dicta*.

**41.** Rule 2–322(a) provides that the defenses of lack of jurisdiction over
the person, improper venue, insufficiency of process, and insufficiency
of service of process are waived if not made before or with the answer.

all the averments except averments or paragraphs that are specifically admitted.

 Other defenses do not take the form of a denial, and chief among those is the "affirmative defense."

> An affirmative defense is one which directly or implicitly concedes the basic position of the opposing party, but which asserts that notwithstanding that concession the opponent is not entitled to prevail because he is precluded for some other reason.

*Armstrong v. Johnson Motor Lines, Inc.*, 12 Md.App. 492, 500, 280 A.2d 24 (1971). Professors Lynch and Bourne succinctly stated the reason to compel explicit pleading of affirmative defenses, thusly:

> If the defensive matter the defendant ultimately wishes to establish does not entail facts that would be logically inconsistent with the factual allegations of the plaintiff's complaint, then a denial of plaintiff's allegations cannot be regarded as putting the plaintiff on notice of such matter.

Modern Maryland Civil Procedure § 6.7(c)(4), 6–77 (2d ed.2004).

In addition to providing notice and due process to the defendant, *see Liberty Mut. Ins. Co. v. Ben Lewis Plumbing, Heating & Air Conditioning*, 121 Md.App. 467, 479, 710 A.2d 338 (1998), requiring disclosure by pleading reduces litigation costs:

> Rule 2–323(a) provides that a claim for relief is brought to issue by filing an answer. To a much greater degree than under prior practice, pleading requirements for defending parties are now intended to define the issues at an early stage in the litigation. A defendant is now required to assert "[e]very defense of law or fact to a claim for relief in a complaint." The general issue plea . . . was deleted in the 1984 rules revision.
>
> The requirement of greater specificity in the answer offers the potential to conserve judicial resources. . . . Discovery can be time-consuming and expensive and, in the federal courts, it has frequently been abused. To the extent

that requirements of detail or specificity in the pleadings can give a court a true picture of whether a claim or defense involves meritorious factual issues, they contribute significantly to judicial economy.

Modern Maryland Civil Procedure § 6.7(c)(1).

In this case, Friolo complained that appellees withheld her wages in violation of the Payment Law. This allegation would ordinarily leave the *bona fide* dispute as an affirmative defense, but because § 3–507.1(b) includes the *absence* of a *bona fide* dispute as a statutory element, Friolo (wisely) *affirmatively plead* that appellees withheld her pay "*not* as a result of a bona fide dispute" (emphasis added). Not all allegations, however, are put at issue, for that requires a denial. As such, the issue would have stood in dispute if appellees denied that allegation, but the record indicates that they did not. Appellees never pled—presumably in the alternative—that even if the agreement was as Friolo alleged, they harbored a good faith belief to the contrary or a good faith belief that the Payment Law did not apply for some other reason. *See Admiral Mortgage*, 357 Md. at 541–42, 745 A.2d 1026.[42] Sec-

---

**42.** There, the Court of Appeals discussed various approaches to the issue of what makes a dispute *"bona fide,"* all of which require actual, subjective belief that the party's position is objectively and reasonably justified:

What constitutes a "bona fide dispute," of course, depends on the circumstances. The term itself has been defined in a number of ways. In determining whether there is a "bona fide dispute" regarding a claim sufficient to preclude a creditor from filing or joining in a petition for involuntary bankruptcy, some Federal courts have looked to whether "there is an objective basis for either a factual or a legal dispute as to the validity of the debt." *See In Re Rimell*, 946 F.2d 1363, 1365 (8th Cir.1991), *cert. denied, Rimell v. Mark Twain Bank*, 504 U.S. 941, 112 S.Ct. 2275, 119 L.Ed.2d 202 (1992), citing other cases. In determining whether a claim, compromised in an accord and satisfaction, results from a "bona fide dispute," the Washington courts have required that the claimant "have a bona fide belief in the validity of his or her position with respect to the claim." *Ward v. Richards & Rossano, Inc., P.S.*, 51 Wash.App. 423, 754 P.2d 120, 125 (Wash.App.1988), citing *Harding v. Will*, 81 Wash.2d 132, 500 P.2d 91 (Wash.1972). *See also Estate Landscape v. Mountain States*, 844 P.2d 322, 326 (Utah 1992) and *S & G Inc. v. Intermountain Power Agency*, 913 P.2d 735, 739 (Utah 1996) (defining the term, for accord

tion 3–507.1(b) conditions enhanced liability on a withholding that is both "in violation of [the Payment Law] *and* not as a result of a bona fide dispute," thus establishing them as independent conditions. The fact that appellees' answer asserted some grounds for exclusion from the Payment law does not necessarily imply that they held those grounds as a good-faith basis for withholding payment. Instead, their answer merely recited a standard set of defenses and alleged that appellees were not liable under the statute because Friolo's complaint "mischaracterize[d] and misrepresent[ed] the terms of any agreements between the parties." [43] Appellees invoked the Wage and Hour Law's statutory exceptions of LE § 3–403(a)(1) and (a)(5) as "affirmative defenses," but they did not assert the existence or nature of their good faith basis for withholding $11,778.85 from appellant in violation of the Payment Law. As such, they failed to deny Friolo's allegation and, under Rule 2–323(a), the issue was admitted as a matter of law.[44]

---

and satisfaction purposes, as a "good-faith disagreement over the amount due under the contract"). Implying a good faith requirement in the Arizona wage payment statute, an Arizona appellate court concluded that the treble damage penalty should not be invoked "when there is a reasonable good faith wage dispute between the employer and the employee." *Apache East, Inc. v. Wiegand,* 119 Ariz. 308, 580 P.2d 769, 773 (Ariz.App.1978).
*Admiral Mortgage,* 357 Md. at 541–42, 745 A.2d 1026.

43. Appellees' general denial of liability in their answer did not attach to Friolo's statutory claims. *See* Rule 2–323(d) ("When the action in any count is for breach of contract, debt, or tort and the claim for relief is for money only, a party may answer that count by a general denial of liability.").

44. Although we do not reach this issue in our holding, the master and trial court erred when they took a jury verdict on the *bona fide* dispute issue to be a condition precedent of treble damages. Although the *Friolo I* Court directed the circuit court to consider the fact that "the jury made no *predicate* finding of a lack of a bona fide dispute," 373 Md. at 530, 819 A.2d 354 (emphasis added), the word "predicate" referred in that instance to a general "finding" on the matter, not necessarily to a *jury* finding. The statute does not specify whether the finding must be by judge or jury, the only difference being that a jury verdict deciding that issue is binding on the court. *Programmers' Consortium, Inc. v. Clark,* 409 Md. 548, 564, 976 A.2d 290 (2009). But

## 2. Costs

Finally, we must address the costs of these proceedings, which is a relatively simple matter in comparison to those above. Under LE §§ 3–427(d) and 3–507.1(b), fees and costs differ only in name. Both are expenses that might deter a meritorious plaintiff from bringing suit and, as such, both are subject to the reasoning we employed in dealing with fees, above. The record does not contain a summary of costs at each stage of the prior proceedings, but their undisputed total was $17,597.57, and our analysis established that, at each stage, Friolo was responsible for eighty-eight percent of the litigation expenses she incurred. Thus, Friolo should recover twelve percent of the $2,447.57 in costs demanded in her sixth and final petition, and she is separately liable for eighty-eight percent of the $15,150.00 special master's fee.

## III. Conclusion

Our analysis of the undisputed factual record established that the court erred as a matter of law when it entered its last judgment in favor of Friolo. The circuit court erroneously ignored the undisputed evidence of reasonable hourly rates, considered what a hypothetical plaintiff would pay *ex-ante*, demanded proof of Friolo's liability to counsel, and subordinated LE §§ 3–427(d) and 3–507.1(b) to MRPC 1.5. For these reasons, the court erred when it entered judgment against appellees in the amount of $5,000.00 for attorney's fees and $2,277.00 for costs, and when it entered judgment against Friolo and appellees and in favor of the special master, each in the amount of $7,575.00.

The unique and undisputed facts of this case left it posed upon a single question of law, which was how to define appellant's "degree of success" when she contributed to litigation by claiming damages far in excess of the jury's eventual award. Our analysis has established that, in keeping with the legislative intent behind LE §§ 3–427(d) and 3–507.1(b),

---

where the jury makes no finding, the issue falls to the court to decide. Md. Rule 2–522(c).

Friolo's fee award must reflect her relative fault in contributing to unnecessary litigation expenses. Having settled that question, and because there were no other disputes of law or fact, we vacate the judgments of the circuit court and enter the following modified judgments in their stead.

JUDGMENTS VACATED. JUDGMENT ENTERED IN FAVOR OF APPELLANT AND AGAINST APPELLEES, JOINTLY AND SEVERALLY, IN THE AMOUNT OF $45,335.28. JUDGMENT ENTERED IN FAVOR OF THE HONORABLE WILLIAM J. ROWAN, III AND AGAINST APPELLANT IN THE AMOUNT OF $13,332.00. JUDGMENT ENTERED IN FAVOR OF THE HONORABLE WILLIAM J. ROWAN, III AND AGAINST APPELLEES, JOINTLY AND SEVERALLY, IN THE AMOUNT OF $1,818.00. COSTS TO BE PAID 88% BY APPELLANT AND 12% BY APPELLEES.